# EXHIBIT G

1  Carolyn Hunt Cottrell (SBN 166977)
Ori Edelstein (SBN 268145)
2  Michelle S. Lim (SBN 315691)
3  SCHNEIDER WALLACE
COTTRELL KONECKY
4  WOTKYNS LLP
2000 Powell Street, Suite 1400
5  Emeryville, California 94608
Telephone: (415) 421-7100
6  Facsimile: (415) 421-7105
ccottrell@schneiderwallace.com
7  oedelstein@schneiderwallace.com
mlim@schneiderwallace.com
8
Attorneys for Plaintiff, the Collective and
9  Putative Class

10  *Additional Counsel on the following page*

11              **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**

13  PAUL MONPLAISIR, on behalf of himself and      Case No.: 3:19-cv-01484-WHA
    all others similarly situated,
14                                                  **DECLARATION OF PAUL MONPLAISIR**
                   Plaintiff,
15
            vs.
16                                                  Judge: Hon. William Alsup
    INTEGRATED TECH GROUP, LLC and
17  ITG COMMUNICATIONS LLC,

18             Defendants.

19
20
21
22
23
24
25
26
27
28

1

2  Sarah R. Schalman-Bergen (admitted *pro hac vice*)
   Krysten Connon (admitted *pro hac vice*)
3  BERGER MONTAGUE PC
   1818 Market Street, Suite 3600
4  Philadelphia, Pennsylvania 19103
   Tel:  (215) 875-3000
5  Fax:  (215) 875-4604
   sschalman-bergen@bm.net
6  kconnon@bm.net

7

8  Attorneys for Plaintiff, the Collective
   and Putative Class
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF PAUL MONPLAISIR**

I, Paul Monplaisir, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1.      I am an adult resident of Lake Worth, Florida.

2.      I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in both California and Florida.

3.      I worked as a Technician in Florida from approximately January 2017 until March 2018.  I then worked as a Technician in California from approximately March 2018 until June 2018.

4.      In Florida, I worked in three ITG branches: West Palm Beach, Broward, and Fort Meyers.  In California, I worked in the San Francisco branch.

5.      During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of cable services for ITG's client(s).  The services included installing cable, Internet, and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

**EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN**

**TYPICAL WORK DAY**

6.      ITG required that I underreport my time, resulting in a substantial number of hours worked for which I was not compensated.  ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working.  Specifically, Technician Supervisors instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate.  Jose Tores, a director for ITG, was in charge of the Technicians and

1  Technician Supervisors.  He told me repeatedly, "It looks better if you don't make as many hours
2  because your production will be higher."  Similarly, my Supervisor in Florida, Hemberto Centiro,
3  told me, "Don't worry about the hours, you make a lot of production."
4           7.     ITG notified me of my jobs for the day between 6:15 a.m. and 7:00 a.m. through
5  "Tech Net," which was later replaced by "Tech 360," which are applications ITG used for
6  managing jobs.  In addition to being notified by Tech Net and later Tech 360, my Supervisors
7  Hemberto and Wilgod, would call me on my personal cellphone if I had not logged in by 7:00 a.m.
8  Throughout my employment at ITG, I used my personal cellphone to log into Tech Net.
9           8.     Throughout my time working as a Technician for ITG, I typically arrived to work
10  between 6:30 a.m. and 6:45 a.m. each day.  My day typically began at the warehouse, where I
11  would load up my truck with equipment.  I waited in line for the equipment between forty-five (45)
12  minutes and one and a half hours (1.5 hours) each day.  This time worked was not recorded.
13          9.     Approximately one day per week, I was also required to report to the warehouse
14  even earlier so that ITG could perform an inventory of the equipment in my vehicle and so I could
15  obtain additional equipment such as modems, cable boxes, remotes, cable cords, coax cables,
16  telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie
17  wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and
18  wood putty from ITG.  My Supervisor in Florida, Hemberto Centiro, and my Supervisor in
19  California, Wilgod (last name unknown), instructed me not to enter the time spent during these
20  inventory check-ins on my time sheets.  As a result, I was not paid for those additional hours of
21  work.
22          10.    My Supervisors Hemberto and Wilgod also required that I attend mandatory weekly
23  meetings to discuss installations and ways to increase productivity.  These meetings were typically

between one (1) hour and one and a half hours (1.5 hours) each week.  I do not believe that I was paid for attending these meetings.

11.     Typically, ITG assigned me between seven (7) and eight (8) jobs per day.  ITG assigned me as many as fifteen (15) jobs in a single day.  ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed.  Individual jobs typically took between one (1) hour and five (5) hours to complete, however, one job could take an entire day to complete.

12.     There were some days I was assigned my full work load and also had to help out other Technicians.  ITG did not count  jobs originally assigned to other Technicians toward my jobs assigned and completed per day.  Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day could increase as much as three (3) extra jobs per day.

13.     During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360.  Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home.  When I arrived at the job and parked the truck outside the customer's home, I would then sign into the job.  Between ten (10) and fifteen (15) times a week, ITG removed the job from the system after I had already arrived at the customer's home.  I typically waited an extra thirty (30) minutes to one (1) hour for the job to come back, but it rarely did, even after I called my Supervisors to complain.  Both Supervisors, Hemberto and Wilgod, often told me that auto routing took the job away once I arrived at the customer's home and that they would email Comcast to get the job back, but the job rarely came back.  I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14.     Similarly, jobs were taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed the job.  I would call both Supervisor Hemberto and Supervisor Wilgod to complain and this was rarely resolved.  I do not believe that I was paid for the time spent on these jobs.

15.     After I completed a job, I would drive to the next job.  The drive time between jobs in Florida often took between fifteen (15) and forty-five (45) minutes, and sometimes as long as one (1) hour.  In California the drive time between jobs often took between thirty (30) minutes and one hour and forty-five minutes (1 hr 45 min).

16.     My day usually ended between 8:00 p.m. and 10:00 p.m.  I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment.  This usually took me between three (3) and four (4) hours.  I believe this time spent at the warehouse was not reported.  I do not believe that I was paid for this time.

17.     In total, I would work typically between six (6) and seven (7) days per week, on average fifteen (15) hours per day, and between ninety (90) and one hundred and five (105) hours per week.

**MEAL BREAKS**

18.     As a Technician, I usually was not provided with full 30-minute meal periods during the first five (5) hours that I was on duty during which I was able to be relieved of all duties.  I was too busy to take meal periods because of ITG's demanding schedule.  The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

19.     Managers and Supervisors did not enforce a 30-minute meal period.  Instead, I was directed by my Supervisors Hemberto and Wilgod to work through my meal periods.  Any time I

DECLARATION OF PAUL MONPLAISIR
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls.

20.     Even though my shifts exceeded ten (10) hours, ITG regularly did not provide me with second meal periods either.

21.     I was considered "on duty" and I generally worked through my meal breaks.  I was not compensated the one hour of premium pay for each workday that the meal periods were not permitted.

## REST BREAKS

22.     As a Field Technician, I generally was not provided with a full 10-minute rest period for every four (4) hours worked during which I was relieved of all duties. There was no particular schedule for rest periods.  This was true throughout my employment with ITG.

23.     My Supervisor instructed me to continue working until each job was finished.  Once I would finish one job, I was instructed to move on to the next job.  I was not allowed rest breaks.

24.     I was considered "on duty" and I do not believe I was paid appropriately.

## MANDATORY TRAINING

25.     ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices.  The orientation took approximately fourteen (14) hours to complete.

26.     After I completed the orientation session, ITG had me accompany an experienced ITG Technician for four (4) weeks in order to learn the job assignments. I was not compensated for all the hours worked, even after complaining to my Supervisor.

## COMPENSATION

27.     While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.  ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code.  My Supervisors, Hemberto and Wilgod, instructed me not to enter a code at all, even though I completed the corresponding task.  My Supervisors, Hemberto and Wilgod, instructed me not to enter any codes when assisting other Technicians with jobs.

28.     My finalized time entries were not accurate and showed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

29.     I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific tasks or jobs. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of the jobs or tasks I completed.

## BUSINESS EXPENSES

30.     In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, a cellular phone, boots, and pants.  I purchased two cellular phones.  My Manager Frank instructed that the cellular phone had to be an iPhone in order to be compatible with ITG's applications.  This was an expense for me.  ITG did not reimburse me for the cellular phone or supply me with a cellular phone. ITG did not provide proper tools necessary to complete the jobs assigned.  I purchased tools

and supplies and I was not reimbursed, even after providing receipts.  I was never reimbursed for these expenses.  Each month I spent up to $300 on tools and supplies.  I provided receipts for all tools and supplies purchased.  I was told that I could purchase tools from ITG, but they charged more than double than if I purchased them at a hardware store.

31.     ITG has a Payment Program where ITG loans funds for the purchase for the purchase of tools needed to complete jobs assigned by ITG.  I did not agree to be a part of this Program because I believe that it would have been cheaper for me to go to a hardware store to purchase the tools myself.  However, I believe that ITG took money out of my paycheck anyway.

32.     The Penguin system showed deductions for the supplies necessary to purchase in order to complete the jobs assigned by ITG.  Once ITG transitioned from using the Penguin application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

33.     I paid for the majority of the fuel that I needed.  ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel.  For the majority of the time, ITG did not supply fuel cards and I ended up paying for most of the fuel myself.  I was not reimbursed, even after I provided fuel receipts.  I provided receipts and was never reimbursed.  In California, ITG provided a fuel card with limitations which included that ITG would only pay $80 per week.  I spent between $200 and $300 a week on fuel.

34.     I believe that ITG also made other deductions from my pay.  For example, if a customer called back with the same service issue, or something was not working properly, I believe that replacement parts were deducted.  I also believe that I was charged for equipment I never lost, and damage to a customer's home that never occurred.  I could see the deductions on Penguin and would complain to both Supervisors, Hemberto and Wilgod; but these issues would not get

DECLARATION OF PAUL MONPLAISIR
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

DocuSign Envelope ID: 2C516790-19AD-4C9F-A4F5-7803F5B901F7

resolved.  Once ITG transitioned to Fuse, I was not able to see any deductions.  I believe that ITG continued to make these deductions.

**EXPERIENCE WORKING AT ITG AS A TRAVELING TECHNICIAN**

35.     ITG had me travel outside of my home region to work at various locations, including California.  I worked in California for four (4) months. I was also a traveling technician in Fort Meyers, Florida for three (3) months as my home was over three (3) hours from Fort Meyers.  I lived in a hotel during those times when I worked for ITG as a Traveling Technician.  I was not compensated for the time it took to travel to my assignments as a Traveling Technician.

36.     When I worked at these locations, ITG only provided me with flights to and from the assigned worksite, a hotel room, twenty-five dollars per diem, and a gas card for up to $80 dollars a week.  The per diem amount was insufficient to cover all of my expenses.  The gas card was also usually insufficient.  Each week I spent up to $125 to cover the fuel expenses, and an additional $250 to cover my per diem expenses.

37.     I often stayed in a cramped hotel room with other Traveling Technicians, and often was required to share a bed or sleep on the floor.


I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this _30th_ day of May, 2019.


DocuSigned by:

Paul Monplaisir

DECLARATION OF PAUL MONPLAISIR
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA