# EXHIBIT H

1  Carolyn Hunt Cottrell (SBN 166977)
   Ori Edelstein (SBN 268145)
2  Michelle S. Lim (SBN 315691)
   SCHNEIDER WALLACE
3  COTTRELL KONECKY
   WOTKYNS LLP
4  2000 Powell Street, Suite 1400
   Emeryville, California 94608
5  Telephone: (415) 421-7100
   Facsimile: (415) 421-7105
6  ccottrell@schneiderwallace.com
   oedelstein@schneiderwallace.com
7  mlim@schneiderwallace.com

8  Attorneys for Plaintiff, the Collective and
9  Putative Class

10 *Additional Counsel on the following page*

11
              **UNITED STATES DISTRICT COURT**
12            **NORTHERN DISTRICT OF CALIFORNIA**

13 | PAUL MONPLAISIR, on behalf of himself and | Case No.: 3:19-cv-01484-WHA
   | all others similarly situated,             |
14 |                                            | **DECLARATION OF JOHN CASON**
   |         Plaintiff,                         |
15 |                                            | Judge: Hon. William Alsup
   |    vs.                                     |
16 |                                            |
   | INTEGRATED TECH GROUP, LLC and             |
17 | ITG COMMUNICATIONS LLC,                    |
   |                                            |
18 |         Defendants.                        |

19
20
21
22
23
24
25
26
27
28

---
DECLARATION OF JOHN CASON
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

Sarah R. Schalman-Bergen (admitted *pro hac vice*)
Krysten Connon (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
sschalman-bergen@bm.net
kconnon@bm.net


Attorneys for Plaintiff, the Collective
and Putative Class

# DECLARATION OF JOHN CASON

I, John Cason, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of San Francisco, California.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in Texas, California, and Florida.

3. I worked as a Technician in Texas from approximately September 2015 until February 2016. I then worked as Technician in Florida from approximately February 2016 until April 2016. In April 2016, I went back to Texas and worked in Texas until December 2017. In December 2017, I was transferred to Florida, where I worked until March 2018. I was then sent to California to work as a Technician from approximately March 2018 to November 2018. I returned to Florida in December 2018 and worked for ITG in Florida until February 2019. I went back to California from February 2019 until April 2019.

4. I worked in the Houston, Texas branch, the San Francisco, California branch and multiple branches in Florida including, Jacksonville, Fort Meyers and West Palm Beach.

5. During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of cable services for ITG's client(s). The services included, installing cable, Internet, and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN

## TYPICAL WORK DAY

6. ITG required that I underreport my time, resulting in a substantial number of hours worked for which I was not compensated. ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working. Specifically, Technician Supervisors instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. The Supervisor on duty, Carmen, Junior, and Wilgod, told me I was not allowed to clock in until 8:00 a.m. even though I was in route by 7:15 a.m. Supervisors also told me to clock in and out throughout the day so that my production would be higer.

7. ITG notified me of my jobs for the day around 7:00 a.m. through "Tech Net," which was later replaced by "Tech 360," which are applications ITG used to assign for managing jobs. In addition to being notified by Tech Net and later Tech 360, my Supervisor on duty would call me if I had not logged in by 7:00 a.m. Specifically, in Houston, Texas my Supervisor Simbo (Olasimbo) would call me if I had not logged in by 7:00 a.m. In Florida, my Supervisor on duty, either Carmen, Augustine or Hemberto (last names unknown), would call me if I had not logged in by 7:00 a.m. In California, my Supervisor on duty, either Carmen or Wilgod, would call if I had not logged in by 7:00 a.m.

8. Throughout my time working as a Technician for ITG, I typically started my work day at approximately 7:15 a.m. each day. In the morning, I usually headed directly to my first customer appointment. On the days I started in the warehouse, I often arrived at approximately 7:00 a.m., where I would load up my truck with equipment. On the days I went to the warehouse in the morning, I waited in line for the equipment between twenty (20) and thirty (30) minutes. I

usually went to the warehouse in the middle of the day when possible. Regardless of when during the day I went, I do not believe that I was paid for the time spent waiting in line to gather equipment. This time worked was not recorded.

9. Approximately one day per week, I was also required to report to the warehouse early so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, such as modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from ITG. I was instructed by my Supervisors in Florida, Carmen and Junior (Hemberto), and my Supervisor in California, Wilgod (last names unknown), not to enter the time spent during these inventory check-ins on my time sheets. Carmen was my Supervisor in both Florida and California. Carmen instructed me not to enter the time spent during inventory check-ins in both Florida and California. As a result, I was not paid for those additional hours of work.

10. My Supervisors, Carmen, Junior and Wilgod, required me to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between fifteen (15) minutes to thirty (30) minutes each week. I do not believe that I was paid for attending these meetings.

11. Typically, ITG assigned me between six (6) and seven (7) jobs per day. At least once a week I was assigned ten (10) jobs a day. ITG assigned me as many as ten (10) jobs in a single day. ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs typically took between one (1) hour and two (2) hours to complete, however, one job could take an entire day to complete.

12. There were some days I was assigned my full work load and also had to help other Technicians. ITG did not count jobs originally assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day could increase as much as one (1) extra job per day. I do not believe I was paid for this time helping out other Technicians.

13. During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer's home, I would then sign into the job. Between three (3) and five (5) times a week, ITG removed the job from the system after I had already arrived at the customer's home. I typically waited an extra fifteen (15) minutes for the job to come back, but it rarely did. On many occasions, I called my Supervisor on duty to complain that a job had been taken away. In Houston, Texas, I called my Supervisor Simbo to complain. In Florida, I called Carmen or Junior (Hemberto) to complain and in California, I called Carmen or Wilgod. In addition to calling my Supervisor on duty to complain, I called my Manager Frank, who was my Manager throughout my employment at ITG, to complain. The jobs rarely came back. I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14. Similarly, jobs were also taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed the job. I would call each Supervisor on duty who typically told me to wait and told me that they would send an email to Dispatch. I complained to my Supervisors Carmen, Junior, and Wilgod, and this was rarely resolved. I do not believe that I was paid for the time spent on these jobs.

15. After I completed a job, I would drive to the next job. The drive time between jobs in Houston, Texas often took between twenty (20) and thirty (30) minutes. In Florida, the drive time often took between twenty (20) and forty-five (45) minutes. In California, the drive time between jobs often took between thirty (30) minutes and one hour and thirty minutes (1.5 hours). I do not believe I was paid appropriately for my drive time.

16. My day usually ended between 7:00 p.m. and 9:00 p.m. I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment. This usually took me approximately two (2) hours. I believe this time spent at the warehouse was not reported. I do not believe that I was paid for this time.

17. In total, I would work typically between six (6) and seven (7) days per week, between twelve (12) and fourteen (14) hours per day, and between seventy-two (72) and ninety-eight (98) hours per week.

**MEAL BREAKS**

18. As a Technician, I usually was not provided with full 30-minute meal periods during the first five (5) hours that I was on duty during which I was able to be relieved of all duties. I was too busy to take meal periods because of ITG's demanding schedule. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

19. Managers and Supervisors did not enforce a 30-minute meal period. Instead, I was directed by my Supervisors, Carmen, Junior, and Wilgod, to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to

any work calls.

20. Even though my shifts exceeded ten (10) hours, ITG regularly did not provide me with second meal periods either.

21. I was considered "on duty" and generally worked through my meal breaks. I do not believe that I was compensated the one hour of premium pay for each workday that the meal periods were not permitted.

## REST BREAKS

22. As a Field Technician, I generally was not provided with full 10-minute rest periods for every four (4) hours worked during which I was relieved of all duties. There was no particular schedule for rest periods. This was true throughout my employment with ITG.

23. My Supervisor instructed me to continue working until each job was finished. Once I would finish one job, I was instructed to move on to the next job. I was not allowed rest breaks.

24. I was considered "on duty" and do not believe I was paid appropriately.

## MANDATORY TRAINING

25. ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices. The orientation took an entire day to complete and I do not believe that I was compensated for this time.

26. After I completed the orientation session, ITG had me accompany an experienced ITG Technician for one (1) week in order to learn the job assignments. I do not believe I was paid for all hours worked, even after complaining to my Supervisor.

## COMPENSATION

27. While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.

28. ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code. My Supervisors, Carmen, Junior and Wilgod, told me not to enter any codes when assisting other Technicians with jobs.

29. My finalized time entries were not accurate and showed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

30. I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific tasks or jobs. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of the jobs or tasks I completed.

**BUSINESS EXPENSES**

31. In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, boots, and pants. ITG did not provide proper tools necessary to complete the jobs assigned. I purchased tools and supplies and I was not reimbursed, even after providing receipts. I was never reimbursed for these expenses. Each month I spent up to $70 on tools and supplies.

32. ITG has a Payment Program where ITG loans the funds for the purchase of tools needed to complete jobs assigned by ITG. I signed ITG's Loan Agreement for the iPhone and

every week ITG deducted $15 from my pay check. At the end of my employment I was forced to return the phone.

33. The Penguin system showed deductions for the supplies necessary to purchase in order to complete the jobs assigned by ITG. Once ITG transitioned from using the Penguin application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

34. I paid for the majority of fuel that I needed. ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. For the majority of the time, ITG did not supply fuel cards and I ended up paying for most of the fuel myself. I was not reimbursed, even after I provided fuel receipts. I spent between $200 and $300 a week in gas in Florida. In California, ITG provided me a fuel card with limitations, including that ITG would only pay $80 per week. I spent approximately $50 a month on gas in California.

35. I believe that ITG made other deductions from my pay. For example, if a customer called back with the same service issue, or something was not working properly, I believe that replacement parts were deducted. I also believe that I was charged for equipment I never lost, and damage to a customer's home that never occurred. I could see the deductions on Penguin and would complain to my Supervisors, Carmen, Junior and Wilgod; but these issues would not get resolved. Once ITG transitioned to Fuse, I was not able to see any deductions. I believe that ITG continued to make these deductions.

## EXPERIENCE WORKING AT ITG AS A TRAVELING TECHNICIAN

36. ITG had me travel outside of my home region to work at various locations, including Texas, California and Florida. I started with ITG as a non-traveling technician in the Houston, Texas branch. When I left Houston, I worked as a traveling technician in Jacksonville, Florida. ITG then sent me back to Houston where I was a traveling technician as I had previously moved from Houston, Texas. After Houston, I continued to work as a traveling technician in West Palm Beach and in Fort Meyers, Florida. When I left Florida, I continued to work as a traveling technician in San Francisco, California. I lived in a five (5) different hotels between the three (3) Florida cities, Houston, Texas and San Francisco, California. In total, I was a traveling technician for approximately two (2) years. The projects in each city lasted between four (4) and six (6) months.

37. When I worked at these locations, ITG only provided me with flights to and from the assigned worksite, a hotel room, twenty-five dollars per diem, and a gas card for up to eighty dollars a week. The per diem amount was insufficient to cover all of my expenses. The gas card was also usually insufficient. Each week I spent up to $50 to cover the fuel expenses, and an additional $150 to cover my per diem expenses.

38. I often stayed in a cramped hotel room with other Traveling Technicians, and often was required to share a bed or sleep on the floor.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 31 day of May, 2019.

DocuSigned by:

John Cason

---

9
DECLARATION OF JOHN CASON
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA