# EXHIBIT I

1  Carolyn Hunt Cottrell (SBN 166977)
2  Ori Edelstein (SBN 268145)
   Michelle S. Lim (SBN 315691)
3  SCHNEIDER WALLACE
   COTTRELL KONECKY
4  WOTKYNS LLP
   2000 Powell Street, Suite 1400
5  Emeryville, California 94608
   Telephone: (415) 421-7100
6  Facsimile: (415) 421-7105
   ccottrell@schneiderwallace.com
7  oedelstein@schneiderwallace.com
   mlim@schneiderwallace.com
8
   Attorneys for Plaintiff, the Collective and
9  Putative Class

10 *Additional Counsel on the following page*

11
12              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

13 | PAUL MONPLAISIR, on behalf of himself and all others similarly situated, | Case No.: 3:19-cv-01484-WHA |
14 |                                                                          |                             |
15 |                Plaintiff,                                                 | **DECLARATION OF MARCUS BRYDIE** |
   |                                                                          | Judge: Hon. William Alsup   |
16 |        vs.                                                                |                             |
17 | INTEGRATED TECH GROUP, LLC and ITG COMMUNICATIONS LLC,                   |                             |
18 |                Defendants.                                                |                             |

19
20
21
22
23
24
25
26
27
28

---

DECLARATION OF MARCUS BRYDIE
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

1
2  Sarah R. Schalman-Bergen (admitted *pro hac vice*)
   Krysten Connon (admitted *pro hac vice*)
3  BERGER MONTAGUE PC
   1818 Market Street, Suite 3600
4  Philadelphia, Pennsylvania 19103
5  Tel:  (215) 875-3000
   Fax:  (215) 875-4604
6  sschalman-bergen@bm.net
   kconnon@bm.net
7
8  Attorneys for Plaintiff, the Collective
   and Putative Class
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF MARCUS BRYDIE
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

# DECLARATION OF MARCUS BRYDIE

I, Marcus Brydie, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of Boynton Beach, Florida.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in Florida.

3. I worked as a Technician in Florida from approximately August 2017 until April 2019.

4. I worked in the Boynton Beach branch.

5. During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of wireless services for ITG's client(s). The services included, installing cable, Internet and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN

## TYPICAL WORK DAY

6. ITG required that I underreport my time, resulting in a substaintial number of hours worked for which I was not compensated. ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working. Specifically, Technician Supervisors instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My Supervisors, Carmen, Junior and Huen, told me I was not allowed to

---

1
DECLARATION OF MARCUS BRYDIE
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

clock in until 8:00 a.m. although I started working over an hour and a half (1.5 hours) earlier. My Supervisors, both Junior and Carmen, and my Manager Frank, told me to enter less hours and this would show higher production. Frank said, "the more jobs you complete, the more you get paid and to keep my hours down."

7. ITG notified me of my jobs for the day at approximately 7:15 a.m. through "Tech Net," which was later replaced by "Tech 360," which are applications ITG used for managing jobs. In addition to being notified by Tech Net and later Tech 360, my Supervisor on duty, either Carmen, Junior (Hemberto) or Huen, would call me on my personal cellphone if I had not logged in by 7:00 a.m. I used my personal cellphone to log into Tech Net from approximately August 2017 until approximately November 2018.

8. Throughout my time working as a Technician for ITG, I typically arrived to work around 6:30 a.m. each day. My day typically began at the warehouse, where I would load up my truck with equipment. I waited in line for the equipment between thirty (30) minutes and one (1) hour a day. This time worked was not recorded.

9. Approximately one day per week, I was also required to report to the warehouse even earlier so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, e.g., modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from ITG. My Supervisors, Carmen, Junior (Hemberto) and Huen instructed me not to enter the time spent during these inventory check-ins on my time sheets. As a result, I was not paid for those additional hours of work.

10. My Supervisors Carmen, Junior (Hemberto) and Huen required me to attend

mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between forty (40) minutes to one hour and a half (1.5 hours) each week. I do not believe that I was paid for attending these meetings.

11. Typically, ITG assigned me between eight (8) and nine (9) jobs per day. ITG assigned me as many as ten (10) jobs in a single day. It is my understanding that ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs typically took between thirty (30) minutes and four (4) hours to complete, however, one job could take an entire day to complete.

12. There were some days I was assigned my full work load and also had to help other Technicians. ITG did not count jobs originally assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day would increase as much as one (1) extra job per day.

13. During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer's home, I would then sign into the job. Between two (2) and three (3) times a week, ITG removed the job from the system after I had already arrived at the customer's home. I typically waited an extra thirty (30) minutes for the job to come back, but it rarely did, even after I complained to my Supervisor. I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14. Similarly, jobs were also taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed

the job. I would call my Supervisor on duty, either Carmen, Junior or Huen, to complain and this was rarely resolved. I do not believe that I was paid for the time spent on these jobs.

15. After I completed a job, I would drive to the next job. The drive time between jobs often took between twenty (20) minutes and forty-five (45) minutes, and sometimes as long as one (1) hour. ITG, however, made me underreport my drive time.

16. My day usually ended between 7:30 p.m. and 8:30 p.m. I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment. This usually took me about two (2) hours due to the long lines. I do not believe I was paid for this time.

17. In total, I would work typically six (6) days per week, between thirteen (13) and fourteen (14) hours per day, and between seventy-eight (78) and eighty-four (84) hours per week.

## MEAL BREAKS

18. As a Technician, I usually was not provided with full 30-minute meal period during which I was able to be relieved of all duties. I was too busy to take meal periods because of ITG's demanding schedule. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

19. Managers and Supervisors did not enforce a 30-minute meal period. Instead, I was directed by my Supervisors, Carmen, Junior and Huen, to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my phone on me at all times and be available to respond to any work calls.

20. I was considered "on duty" and I generally worked through my meal breaks. I do not believe I was paid appropriately.

## REST BREAKS

21. As a Field Technician, I generally was not provided rest breaks. There was no particular schedule for rest periods. This was true throughout my employment with ITG.

22. My Supervisor instructed me to continue working until each job was finished. Once I would finish one job, I was instructed to move on to the next job. I was not allowed rest breaks.

23. I do not believe that I was paid for working through my rest breaks. I was considered "on duty" and, although I worked through my rest breaks. I do not believe I was paid appropriately.

## MANDATORY TRAINING

24. ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices. The orientation took a full day to complete and I do not believe that I was compensated for this time.

25. After I completed the orientation session, ITG had me accompany an experienced ITG Technician for two and a half (2.5) weeks in order to learn the job assignments. I was not compensated for all the hours worked even after complaining to my Supervisor.

## COMPENSATION

26. While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.

27. ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code. My Supervisors, Carmen, Junior and Huen, would instruct me not to enter a

code at all, even though I completed the corresponding task.  My Supervisors, Carmen, Junior and Huen, told me not to enter any codes when assisting other Technicians with jobs.

28. My finalized time entries were not accurate and showed a lower number of hours than I actually worked.  My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

29. I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific tasks or jobs. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of the jobs or tasks I completed.

## BUSINESS EXPENSES

30. In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, a cellular phone through ITG's payment plan, boots, and pants.  ITG did not provide proper tools necessary to complete the jobs assigned. I purchased tools and supplies and I was not reimbursed.  Each month I spent approximately $100 on tools and supplies.  I was never reimbursed for these expenses.

31. ITG has a Payment Program where ITG loans funds for the purchase of tools needed to complete jobs assigned by ITG.  I only signed the loan agreement for the iPhone.  However, ITG also charged me approximately $2,000 for equipment I never received.  I was charged for tools that I never received.

32. The Penguin system showed deductions for the supplies necessary to purchase in order to complete the jobs assigned by ITG.  Once ITG transitioned from using the Penguin

application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

33. I paid for the majority of fuel that I needed. ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. For the majority of the time, ITG did not supply fuel cards and I ended up paying for most of the fuel myself. I was not reimbursed, even after I provided fuel receipts. I was only supplied a fuel card my last four (4) months at ITG. Before the fuel card, I spent approximately $100 a week on fuel.

34. I believe that ITG made other deductions from my pay. For example, if a customer called back with the same service issue, or something was not working properly, I believe replacement parts were deducted. I also believe that I was charged for equipment I never lost, and damage to a customer's home that never occurred. I could see the deductions on Penguin and would complain to my Supervisors, Carmen, Junior and Huen; but these issues would not get resolved. Once ITG transitioned to Fuse, I was not able to see any deductions. I believe that ITG continued to make these deductions.

**EMPLOYMENT**

35. ITG required I sign a number of documents in order to work for the company. I felt that if I did not sign the documents, I would not be able to work for ITG.

36. I was only given a few minutes to look at these documents and I did not receive a copy of them after I signed them. I was afraid to ask any questions.

1  I declare under penalty of perjury under the laws of the State of Florida that the foregoing is
2  true and correct and based upon my own personal knowledge.
3  Executed on this __31__ day of May, 2019.

DocuSigned by:

_____
Marcus Brydie