EXHIBIT L

1  Carolyn Hunt Cottrell (SBN 166977)
2  Ori Edelstein (SBN 268145)
   Michelle S. Lim (SBN 315691)
3  SCHNEIDER WALLACE
   COTTRELL KONECKY
4  WOTKYNS LLP
   2000 Powell Street, Suite 1400
5  Emeryville, California 94608
   Telephone: (415) 421-7100
6  Facsimile: (415) 421-7105
   ccottrell@schneiderwallace.com
7  oedelstein@schneiderwallace.com
   mlim@schneiderwallace.com
8
   Attorneys for Plaintiff, the Collective and
9  Putative Class

10 *Additional Counsel on the following page*

11              **UNITED STATES DISTRICT COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**

13 | PAUL MONPLAISIR, on behalf of himself and all others similarly situated, | Case No.: 3:19-cv-01484-WHA |
14 | | |
15 | Plaintiff, | **DECLARATION OF STERLING FRANCOIS** |
16 | vs. | Judge: Hon. William Alsup |
17 | INTEGRATED TECH GROUP, LLC and ITG COMMUNICATIONS LLC, | |
18 | Defendants. | |

---

DECLARATION OF STERLING FRANCOIS
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

1
2  Sarah R. Schalman-Bergen (admitted *pro hac vice*)
3  Krysten Connon (admitted *pro hac vice*)
   BERGER MONTAGUE PC
4  1818 Market Street, Suite 3600
   Philadelphia, Pennsylvania 19103
5  Tel:  (215) 875-3000
   Fax:  (215) 875-4604
6  sschalman-bergen@bm.net
   kconnon@bm.net
7
8  Attorneys for Plaintiff, the Collective
9  and Putative Class
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF STERLING FRANCOIS
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

# DECLARATION OF STERLING FRANCOIS

I, Sterling Francois, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of Boynton Beach, Florida.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in both Florida and Pennsylvania.

3. I worked as a Technician in Florida from approximately July 2017 until approximately April 2018. I worked as a Technician in Pennsylvania from approximately April 2018 until May 2018. Thereafter, I worked as a Technician in Florida until June 2018.

4. I worked in the Pittsburgh, Pennsylvania branch and the West Palm Beach, Boca and Fort Myers branches in Florida.

5. During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of wireless services for ITG's client(s). The services included installing cable, Internet and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN

## TYPICAL WORK DAY

6. ITG required that I underreport my time, resulting in a substantial number of hours worked for which I was not compensated. ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working. Specifically, Technician

Supervisors instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My Supervisor Carmen said, "Don't worry about the hours."

7. ITG notified me of my jobs for the day between 6:30 a.m. and 7:00 a.m. through "Tech Net," which was later replaced by "Tech 360," which are applications ITG used to for managing jobs. In addition to being notified by Tech Net and later Tech 360, my Supervisors, Carmen and Junior, would call me on my cellphone if I had not logged in by 7:00 a.m. Throughout my employment at ITG, I used my personal cellphone to log into Tech Net.

8. Throughout my time working as a Technician for ITG, I typically arrived to work at approximately 7:00 a.m. each day. My day typically began at the warehouse, where I would load up my truck with equipment. I waited in line for the equipment between approximately thirty (30) minutes and one (1) hour a day. I do not believe that I was paid for the time spent waiting in line to gather equipment.

9. Approximately one day per week, I was also required to report to the warehouse even earlier so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, such as modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from ITG. I was instructed not to enter the time spent during these inventory check-ins on my time sheets. As a result, I was not paid for those additional hours of work.

10. My Supervisors, Carmen and Junior, required me to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between thirty (30) minutes to one (1) hour each week. I do not believe that I was paid for attending these meetings.

11. Typically, ITG assigned me between five (5) and seven (7) jobs per day. ITG assigned me as many as ten (10) jobs in a single day. ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs typically took between one (1) hour and four (4) hours to complete, however, one (1) job could take an entire day to complete.

12. There were some days I was assigned my full work load and I also had to help other Technicians. ITG did not count jobs originally assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day could increase as much as one (1) extra job per day.

13. During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer home, I would then sign into the job. Approximately two (2) times a week, ITG removed the job from the system after I had already arrived at the customer's home. I typically waited one (1) extra hour for the job to come back, but it did not always come back, even after complaining to my Supervisors. I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14. Similarly, jobs were also taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed the job. I would call the Supervisor on duty, either Carmen or Junior, to complain and this was rarely resolved. I do not believe that I was paid for the time spent on these jobs.

15. After I completed a job, I would drive to the next job. The drive time between jobs in Florida often took between thirty (30) and forty-five (45) minutes, and sometimes as long as one (1) hour. In Pennsylvania, the drive time between jobs often took between forty (40) minutes and one hour and thirty minutes (1.5 hours). I do not believe I was paid appropriately for my drive time.

16. My day usually ended between 7:00 p.m. and 9:00 p.m. I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment. This usually took me about three (3) hours. I believe this time at the warehouse was not reported. As a result, I do not believe I was paid for this time.

17. In total, I would work typically between six (6) and seven (7) days per week, between twelve (12) and sixteen (16) hours per day, and between seventy-two (72) and one hundred and twelve (112) hours per week.

## MEAL BREAKS

18. As a Technician, I usually was not provided with full 30-minute meal period which I was able to be relieved of all duties. I was too busy to take meal periods because of ITG's demanding schedule. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

19. Managers and Supervisors did not enforce a 30-minute meal period. Instead, I was directed by my Supervisors Carmen and Junior to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls.

20. I was considered "on duty" and generally worked through my meal breaks. I do not believe that I was paid appropriately.

### REST BREAKS

21. As a Field Technician, I generally was not provided with rest breaks. There was no particular schedule for rest periods. This was true throughout my employment with ITG.

22. My Supervisor instructed me to continue working until each job was finished. Once I would finish one job, I was instructed to move on to the next job. I was not allowed rest breaks.

23. I was considered "on duty" and do not believe I was paid appropriately.

### MANDATORY TRAINING

24. ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices. The orientation took a full day to complete and I do not believe that I was compensated for this time.

25. After I completed the orientation session, ITG had me accompany an experienced ITG Technician for approximately one (1) week in order to learn the job assignments. I do not believe I was paid for all hours worked even after complaining to my Supervisor.

### COMPENSATION

26. While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.

27. ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code. My Supervisors, Carmen and Junior, would also instruct me not to enter a code at all, even though I completed the corresponding task. My Supervisors also told me not to enter any codes when assisting other Technicians with jobs.

28. My finalized time entries were not accurate and showed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

29. I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific tasks or jobs. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of the jobs or tasks I completed.

## BUSINESS EXPENSES

30. In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, a cellular phone, boots and pants. I had to use my own cellular phone. The cellular phone had to be an iPhone to be compatible with ITG's applications. ITG did not reimburse me for the phone or supply me with a phone. ITG did not provide proper tools necessary to complete the jobs assigned. I purchased tools and supplies and I was not reimbursed, even after providing receipts. I was never reimbursed for these expenses. I spent about $500 on tools and supplies.

31. ITG has a Payment Program where ITG loans the funds for the purchase of tools needed to complete jobs assigned by ITG. I believe that ITG took money out of my paycheck for this program.

32. The Penguin system shows deductions for the supplies necessary to purchase in order to complete the jobs assigned by ITG. Once ITG transitioned from using the Penguin application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

33. I paid for the majority of the fuel that I needed. ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. For the majority of the time, ITG did not supply fuel cards and I ended up paying for most of the fuel myself. I was not reimbursed. I spent more than $200 a week in Florida on fuel.

34. I believe that ITG made other deductions from my pay. For example, if a customer called back with the same service issue, or something was not working properly, I believe that replacement parts were deducted. I also believe that I was charged for equipment I never lost, and damage to a customer's home that never occurred. I could see the deductions on Penguin and would complain; but these issues would not get resolved. Once ITG transitioned to Fuse, I was not able to see any deductions. I believe that ITG continued to make these deductions.

### EXPERIENCE WORKING AT ITG AS A TRAVELING TECHNICIAN

35. ITG had me travel outside of my home region to work at various locations, including Pennsylvania. I worked in Pennsylvania for two (2) months. I was a Traveling Technician in Fort Meyers, Florida for two (2) months as my home was over two (2) hours from Fort Meyers. I lived in a hotel during those times when I worked for ITG as a Traveling Technician.

36. When I worked at these locations, ITG only provided me with a hotel room, twenty-five dollars ($25) per diem, and a gas card for up to $80 a week. I was not paid for my drive to and from Pittsburgh, Pennsylvania and to and from Fort Meyers, Florida. The per diem amount was insufficient to cover all of my expenses. The gas card was also usually insufficient. Each week I spent up to $100 to cover the fuel expenses, and an additional $100 to cover my per diem expenses.

37. I often stayed in a cramped hotel room with other Traveling Technicians, and often was required to share a bed or sleep on the floor.

## EMPLOYMENT

38. ITG required I sign a number of documents in order to work for the company. I felt that if I did not sign the documents, I would not be able to work for ITG.

39. I was only given a few minutes to look at the documents and I did not receive a copy of them after I signed them. I was afraid to ask any questions.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 05/30 day of May, 2019.

Sterling Francois

---

8
DECLARATION OF STERLING FRANCOIS
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA