# EXHIBIT M

1  Carolyn Hunt Cottrell (SBN 166977)
   Ori Edelstein (SBN 268145)
2  Michelle S. Lim (SBN 315691)
   SCHNEIDER WALLACE
3  COTTRELL KONECKY
   WOTKYNS LLP
4  2000 Powell Street, Suite 1400
   Emeryville, California 94608
5  Telephone: (415) 421-7100
   Facsimile: (415) 421-7105
6  ccottrell@schneiderwallace.com
   oedelstein@schneiderwallace.com
7  mlim@schneiderwallace.com

8  Attorneys for Plaintiff, the Collective and
   Putative Class
9
10 *Additional Counsel on the following page*

11             **UNITED STATES DISTRICT COURT**
               **NORTHERN DISTRICT OF CALIFORNIA**
12

13 | PAUL MONPLAISIR, on behalf of himself and all others similarly situated, | Case No.: 3:19-cv-01484-WHA |
14 | | **DECLARATION OF JOEL GAUTHIER** |
   | Plaintiff, | |
15 | | |
   | vs. | Judge: Hon. William Alsup |
16 | | |
   | INTEGRATED TECH GROUP, LLC and ITG COMMUNICATIONS LLC, | |
17 | | |
   | Defendants. | |
18

Sarah R. Schalman-Bergen (admitted *pro hac vice*)
Krysten Connon (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
sschalman-bergen@bm.net
kconnon@bm.net

Attorneys for Plaintiff, the Collective
and Putative Class

---

DECLARATION OF JOEL GAUTHIER
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

## DECLARATION OF JOEL GAUTHIER

I, Joel Gauthier, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of Miami, Florida.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in Florida.

3. I worked as a Technician in Florida from approximately September 2017 until March 2019.

4. I worked in the Miami, Broward and Key West, Florida branches.

5. During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of cable services for ITG's client(s). The services included, installing cable, Internet and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN

## TYPICAL WORK DAY

6. ITG required that I underreport my time, resulting in a substantial number of hours worked for which I was not compensated. ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working. Specifically, Technician Supervisors instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate. My Supervisor Linus (last name unknown) would say, "you need to put less amount of hours to show

---

higher production, and make money. You know the company doesn't like that." My Supervisors Linus, Jose Morado and Pierre (last name unknown) (Miami) would say, "while you work you need to clock in and out, so the production is high." I would finish at 7:00 p.m. and my time sheets would show I finished at 3:00 p.m. When I went over 40 hours for the week, my Supervisors Linus, Jose and Eddie (last name unknown) would call me and warn me to clock in and out because I had too many hours.

7. ITG notified me of my jobs for the day approximately at 7:00 a.m. through "Tech Net," which was later replaced by "Tech 360," which are applications ITG used for managing jobs. In addition to being notified by Tech Net and later Tech 360, both of my Supervisors in Key West, Eddie and Jose, would call me on ITG's iPhone if I had not logged in by 7:00 a.m. Similarly, my Supervisors in Miami, Linus and Pierre would call me if I had not logged in by 7:00 a.m. In Broward, my Supervisor Pierre (last name unknown) (Broward), would call me if I had not logged in by 7:00 a.m.

8. Throughout my time working as a Technician for ITG, I typically arrived to work between 6:30 a.m. and 7:00 a.m. each day. While working in Miami and Broward, my day typically began at the warehouse, where I would load up my truck with equipment. I waited in line for the equipment between thirty (30) minutes and one (1) hour each day. This time worked was not recorded.

9. Approximately one day per week, I was also required to report to the warehouse about one hour before I started the day's jobs, so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, such as modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic

moldings and wood putty from ITG. I was instructed not to enter the time spent during these inventory check-ins on my time sheets. As a result, I was not paid for those additional hours of work.

10. ITG required all technicians, including myself to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were approximately one (1) hour each week. I do not believe that I was paid for attending these meetings.

11. Typically, ITG assigned me between four (4) and six (6) jobs per day. ITG assigned me as many as ten (10) jobs in a single day. ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs typically took between two (2) hour and four (4) hours to complete, however, one job could take an entire day to complete.

12. There were some days I was assigned my full work load and also had to help out other Technicians. ITG did not count jobs originally assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day would increase as much as one (1) extra jobs per day. Throughout the day, I was also required to assist other Technicians with their jobs. Only the Technician that was originally assigned the job was paid for the job completed. It is my understanding I was not paid for this time helping other Technicians.

13. During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer's home, I would then sign into the job. Between three (3) and four (4) times a week, ITG removed the job from the system after I had already arrived at the customer's home. I typically waited an extra thirty (30) minutes to one

(1) hour for the job to come back, but it rarely did. I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14. On many occasions, I called my Supervisor Jose, when working in Key West, to complain that a job had been taken away and he would try to help me get the job back. He would say to stand by and wait for Dispatch. When working in Miami and Broward, I would call the Supervisor on duty, either Linus, Pierre (Miami) or Pierre (Broward) to complain. I would call Linus and he would tell me there is nothing we can do and if I was not happy I should just quit.

15. Similarly, jobs were also taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed the job. I would call both of my Supervisors in Key West, Jose and Eddie, to complain and this was rarely resolved. In Miami, I would call Linus to complain that I had spent time working on a job. He would say, "This is how ITG works; it you don't like it then quit." I do not believe that I was paid for the time spent on these jobs.

16. After I completed a job, I would drive to the next job. The drive time between jobs often took between thirty (30) minutes and forty (40), and sometimes as long as one (1) hour. ITG, however, made me underreport my drive time.

17. My day usually ended between 7:00 p.m. and 10:00 p.m. I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment. This usually took me approximately two (2) hours. I believe this time spent at the warehouse was not reported. I do not believe I was paid for this time.

18.     In total, I would work typically days per week, six (6) hours per day, and between twelve (12) and fifteen (15) hours a day and between seventy-two (72) and ninety (90) hours per week.

## MEAL BREAKS

19.     As a Technician, I usually was not provided with full 30-minute meal period during which I was able to be relieved of all duties.  I was too busy to take meal periods because of ITG's demanding schedule.  The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

20.     Managers and Supervisors did not enforce a 30-minute meal period.  Instead, I was directed by my Supervisor to work through my meal periods.  Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my phone on me at all times and be available to respond to any work calls.

21.     I was considered "on duty" and, although I worked through my meal breaks.  I do not believe I was paid appropriately.

## REST BREAKS

22.     As a Field Technician, I generally was not provided rest breaks.  There was no particular schedule for rest periods.  This was true throughout my employment with ITG.

23.     My Supervisor instructed me to continue working until each job was finished.  Once I would finish one job, I was instructed to move on to the next job.  I was not allowed rest breaks.

24.     I was considered "on duty" and I do not believe I was paid appropriately.

## MANDATORY TRAINING

25. ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices. The orientation took approximately eight (8) hours to complete.

26. After I completed the orientation session, ITG had me accompany an experienced ITG Technician for six (6) weeks in order to learn the job assignments. I was not compensated for all the hours worked, even after complaining to my Supervisor.

## COMPENSATION

27. While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.

28. ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code. My Supervisors, Linus, Jose, Pierre (Miami), Pierre (Broward) and Eddie, would instruct me not to enter a code at all, even though I completed the corresponding task. My Supervisors, Linus, Jose, Pierre (Miami), Pierre (Broward) and Eddie, told me not to enter any codes when assisting other Technicians with jobs.

29. My finalized time entries were not accurate and showed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

30. I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific tasks or jobs. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of the jobs or tasks I completed.

## BUSINESS EXPENSES

31. In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, boots, and pants. ITG did not provide proper tools necessary to complete the jobs assigned. I purchased tools and supplies and I was not reimbursed, even after providing receipts. Each month I spent up approximately $50 on tools and supplies. I was never reimbursed for these expenses.

32. ITG has a Payment Program where ITG loans funds for the purchase of tools needed to complete jobs assigned by ITG. Although I purchased the majority of my own tools, I signed the loan agreement and ITG took money out of my paycheck for tools and supplies.

33. The Penguin system showed deductions for the supplies necessary to purchase in order to complete the jobs assigned by ITG. Once ITG transitioned from using the Penguin application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

34. I paid for the majority of the fuel that I needed. ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. For the majority of the time, ITG did not supply fuel cards and I ended up paying for some of the fuel myself. I was not reimbursed, even after I provided fuel receipts.

35. I believe that ITG made other deductions from my pay. For example, if a customer called back with the same service issue, or something was not working properly, I believe that replacement parts were deducted. I also believe I was charged for equipment I never lost, and damage to a customer's home that never occurred. I could see the deductions on Penguin and would complain to my Supervisors, Linus, Jose, Pierre (Miami), Pierre (Broward) and Eddie, but these issues would

1  not get resolved. Once ITG transitioned to Fuse, I was not able to see any deductions. I believe that
2  ITG continued to make these deductions.

### EXPERIENCE WORKING AT ITG AS A TRAVELING TECHNICIAN

36. ITG had me travel outside of my home region to work in Key West, Florida. I worked in Key West as a traveling technician starting in October 2017. I worked in Key West for one (1) year. The majority of my employment with ITG, was spent as a traveling technician in Key West, Florida.

37. When I worked at these locations, ITG only provided me with flights to and from the assigned worksite, a hotel room, twenty-five dollars per diem, and a gas card for up to eighty dollars a week. The per diem amount was insufficient to cover all of my expenses. The gas card was also usually insufficient. Each week I spent an additional $200 a week on living expenses.

38. I often stayed in a cramped hotel room with other Traveling Technicians, and often was required to share a bed or sleep on the floor.

### EMPLOYMENT

39. ITG required I sign a number of documents in order to work for the company. I felt that if I did not sign the documents, I would not be able to work for ITG.

40. I was only given a few minutes to look at the documents and I did not receive a copy of them after I signed them. I was afraid to ask any questions.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this   30   day of May, 2019.



Joel Gauthier

---

8
DECLARATION OF JOEL GAUTHIER
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA