# EXHIBIT O

1  Carolyn Hunt Cottrell (SBN 166977)
2  Ori Edelstein (SBN 268145)
   Michelle S. Lim (SBN 315691)
3  SCHNEIDER WALLACE
   COTTRELL KONECKY
4  WOTKYNS LLP
   2000 Powell Street, Suite 1400
5  Emeryville, California 94608
   Telephone: (415) 421-7100
6  Facsimile: (415) 421-7105
   ccottrell@schneiderwallace.com
7  oedelstein@schneiderwallace.com
   mlim@schneiderwallace.com
8
   Attorneys for Plaintiff, the Collective and
9  Putative Class

10 *Additional Counsel on the following page*

11                **UNITED STATES DISTRICT COURT**
12                **NORTHERN DISTRICT OF CALIFORNIA**

13 PAUL MONPLAISIR, on behalf of himself and    Case No.: 3:19-cv-01484-WHA
   all others similarly situated,
14                                               **DECLARATION OF RAPHAEL PARRIS**
               Plaintiff,
15                                               Judge: Hon. William Alsup
         vs.
16
   INTEGRATED TECH GROUP, LLC and
17 ITG COMMUNICATIONS LLC,

18             Defendants.

---

DECLARATION OF RAPHAEL PARRIS
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

1
2  Sarah R. Schalman-Bergen (admitted *pro hac vice*)
3  Krysten Connon (admitted *pro hac vice*)
   BERGER MONTAGUE PC
4  1818 Market Street, Suite 3600
   Philadelphia, Pennsylvania 19103
5  Tel:  (215) 875-3000
   Fax:  (215) 875-4604
6  sschalman-bergen@bm.net
   kconnon@bm.net
7
8  Attorneys for Plaintiff, the Collective
9  and Putative Class
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DECLARATION OF RAPHAEL PARRIS
*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

## **DECLARATION OF RAPHAEL PARRIS**

I, Raphael Parris, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of West Palm Beach, Florida.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in both California and Florida.

3. I worked as a Technician in Florida from approximately November 2017 until May 2018. I then worked as a Technician in California from approximately May 2018 until August 2018.

4. I worked in the San Francisco, California and Boynton Beach, Florida branches.

5. During my time working for ITG as a Technician, I performed various services, all related to the installation and repair of cable services for ITG's client(s). The services included installing cable, Internet and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## **EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN**

## **TYPICAL WORK DAY**

6. ITG required me to underreport my time, resulting in a substantial number of hours worked for which I was not compensated. ITG told me to enter that my beginning time was typically an hour after I actually started working, and ITG typically required me to enter that I stopped working several hours before I actually stopped working. Specifically, Technician Supervisors, Managers, ITG's Vice President Elias (last name unknown), and Gissel (last name

unknown) in Human Resources, instructed me to reduce my true hours worked in order to show higher production and increase my hourly rate.

7. ITG notified me of my jobs for the day around 7:00 a.m. through "Tech Net," which was later replaced by "Tech 360," which are applications ITG used for managing jobs. In addition to being notified by Tech Net and later Tech 360, both of my Supervisors in Florida, Carmen Augustine and Hemberto Centiro, and my Supervisor in California, Wilgod (last name unknown), would call me if I had not logged in by 7:00 a.m. ITG's applications are only compatible with an iPhone. When I first started working at ITG, I had an Android phone. I purchased an iPhone through ITG's payment plan. Every week I paid $15 for the use of the iPhone and when I stopped working for ITG I had to return the phone. I never owned the phone, although I paid every week to use the phone.

8. Throughout my time working as a Technician for ITG, I typically arrived to work at approximately 7:00 a.m. each day. My day typically began at the warehouse, where I would load up my truck with equipment. I waited in line for the equipment between forty (40) minutes and one (1) hour each day. This time worked was not recorded.

9. Approximately one day per week, I was also required to report to the warehouse even earlier so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment such as modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from ITG. My Supervisors in Florida, Carmen Augustine and Hemberto Centiro, and my Supervisor in California, Wilgod, instructed me not to enter the time spent during these

inventory check-ins on my time sheets. As a result, I was not paid for those additional hours of work.

10. My Supervisors Carmen, Hemberto, and Wilgod required me to attend mandatory weekly meetings to discuss installations and ways to increase productivity. These meetings were typically between one (1) and two (2) hours each week. Sometimes these meetings occurred two (2) times a week. I do not believe that I was paid for attending these meetings.

11. Typically, ITG assigned me between seven (7) and eight (8) jobs per day. ITG assigned me as many as ten (10) jobs in a single day. ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs typically took between one (1) hour and six (6) hours to complete, however, one job could take an entire day to complete.

12. There were some days I was assigned my full work load and also had to help other Technicians. ITG did not count jobs originally assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day could increase as much as one (1) extra job per day. My Supervisors, Carmen, Hemberto, and Wilgod would call me throughout the day to help out other Technicians. I do not believe that I was paid for this time helping other Technicians.

13. During the course of the day, ITG sometimes added or removed my job assignments from Tech Net, and later Tech 360. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer's home, I would then sign into the job. Between eight (8) and ten (10) times a week, ITG removed the job from the system after I had already arrived at the customer's home. I typically waited an extra

thirty (30) minutes for the job to come back, but it rarely did. I would call my Supervisor on duty, either Hemberto, Carmen or Wilgod, to call and complain the job was taken away after I arrived at the customer's home. On many occasions, I called my Supervisor on duty, either Hemberto, Carmen, or Wilgod, to complain that a job had been taken away. My Supervisor Hemberto would tell me to stand by and that he would make a phone call and to hold on. When this happened, I would also call and text Dispatch through Tech Net to complain. The jobs rarely came back. I do not believe that I was paid for the time spent driving to the canceled job or waiting for it to come back.

14. Similarly, jobs were also taken away from me when I was in the middle of a job or had completed the job, but had not yet signed into Tech Net or Tech 360 to enter that I completed the job. I would call the Supervisor on duty, either Hemberto, Carmen, or Wilgod, to complain and this was rarely resolved. I do not believe that I was paid for the time spent on these jobs.

15. After I completed a job, I would drive to the next job. The drive time between jobs in Florida often took between ten (10) minutes and one (1) hour. In California the drive time between jobs often took between thirty (30) minutes and forty-five (45) minutes. I was repeatedly told by each Supervisor -- Hemberto, Carmen and Wilgod -- to report less drive time. I do not believe I was paid appropriately for my drive time.

16. My day usually ended between 7:00 p.m. and 10:00 p.m. I would drive home after completing my last job except for once every other week I would drive to the warehouse after my last job to return equipment and for ITG to check the status of the equipment. This usually took me between three (3) and four (4) hours due to the long lines. I believe this time spent at the warehouse was not reported. As a result, I do not believe I was paid for this time.

4
DECLARATION OF RAPHAEL PARRIS

*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA

17. In total, I would work typically between six (6) and seven (7) days per week, between twelve (12) and fourteen (14) hours per day, and between seventy-two (72) and ninety-eight (98) hours per week.

## MEAL BREAKS

18. As a Technician, I usually was not provided with full 30-minute meal periods during the first five (5) hours that I was on duty during which I was able to be relieved of all duties. I was too busy to take meal periods because of ITG's demanding schedule. The number of jobs assigned in a given day, the amount of time jobs typically took to complete, and the pressure placed upon me by Supervisors to complete all daily assignments made it nearly impossible to take a meal break.

19. My Supervisors, Hemberto, Carmen and Wilgod, did not enforce a 30-minute meal period. Instead, I was directed by each Supervisor to work through my meal periods. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls.

20. Even though my shifts exceeded ten (10) hours, ITG regularly did not provide me with second meal periods either.

21. I was considered "on duty" and I generally worked through my meal breaks. I was not compensated for the one hour of premium pay for each workday that the meal periods were not permitted.

## REST BREAKS

22. As a Field Technician, I generally was not provided with full 10-minute rest periods for every four (4) hours worked during which I was relieved of all duties. There was no particular schedule for rest periods. This was true throughout my employment with ITG.

23.     My Supervisor instructed me to continue working until each job was finished. Once I would finish one job, I was instructed to move on to the next job. I was not allowed rest breaks.

24.     I was considered "on duty" and do not believe I was paid appropriately.

## MANDATORY TRAINING

25.     ITG required me to attend a full day, mandatory orientation session to familiarize myself to ITG's policies and practices. The orientation took an entire day to complete and I do not believe that I was compensated for this time.

26.     After I completed the orientation session, ITG had me accompany an experienced ITG Technician for one week in order to learn the job assignments. I do not believe I was compensated for all hours worked, even after I complained to my Supervisor.

## COMPENSATION

27.     While working for ITG, I entered codes and hours through the Penguin application, which was replaced by the Fuse application, for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount.

28.     ITG would regularly delete codes for tasks I had completed, or change the codes to a lower paying code. My Supervisors, Hemberto, Carmen and Wilgod, would instruct me not to enter a code at all, even though I completed the corresponding task. In addition, my Supervisors, Hemberto, Carmen and Wilgod, told me not to enter any codes when assisting other Technicians with jobs.

29.     My finalized time entries were not accurate and sowed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent: attending orientation and training, working prior to my shifts, taking any meal break, working on jobs that took over two hours, and driving to and between jobs.

30. I did not receive accurate wage statements. My pay stubs showed several regular and overtime rates, but they did not reflect my specific task or jobs. My pay stubs did not include all the hours I worked, compensation for missed meals and rest periods, or all of the jobs or tasks I completed.

## BUSINESS EXPENSES

31. In order to do my job, I had to purchase tools and equipment, such as a wireless drill, drill bits, pliers, screwdriver, staple gun, nails, splitters, net gear, many types of cable, boot, pants and a cellular phone through ITG's payment plan. ITG did not provide proper tools necessary to complete the jobs assigned. I purchased tools and supplies and I was not reimbursed, even after providing receipts. I was never reimbursed for these expenses.

32. ITG has a Payment Program where ITG loans the funds for the purchase of tools needed to complete jobs assigned by ITG. I signed ITG's Loan Agreement for the iPhone. I did not sign ITG's Loan Agreement for other tools. However, I believe that ITG took money out of my pay check for tools anyway.

33. The Penguin system showed deductions for the supplies nececcary to purchase in order to complete the jobs assigned by ITG. Once ITG transitioned from using the Penguin application to the Fuse application, I was unable to see the dollar amount deductions taken out of my paycheck for tools and supplies.

34. I paid for the majority of the fuel that I needed. ITG sometimes provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. For the majority of the time, ITG did not supply fuel cards and I ended up paying for most of the fuel myself. I was not reimbursed, even after I provided fuel receipts. One of my biggest issues with ITG was paying for fuel. I spent approximately $250 a week for fuel.

35. I believe that ITG made other deductions from my pay. For example, if a customer called back with the same service issue, or something was not working properly, I believe that replacement parts were deducted. I also believe I was charged for equipment I never lost, and damage to a customer's home that never occurred. I could see the deductions on Penguin and would complain to my Supervisors, Hemberto, Carmen and Wilgod, but these issues would not get resolved. Once ITG transitioned to Fuse, I was not able to see any deductions. I believe that ITG continued to make these deductions.

### EXPERIENCE WORKING AT ITG AS A TRAVELING TECHNICIAN

36. ITG had me travel outside of my home region to work at various locations, including California. I worked at in San Francisco, California as a Traveling Technician from May 2018 to August 2018. I worked in California for four (4) months.

37. When I worked outside of my home region, ITG only provided me with flights to and from the assigned worksite, a hotel room, twenty-five dollars per diem, and a gas card for up to eighty dollars a week. The per diem amount was insufficient to cover all of my expenses. The gas card was also usually insufficient. I spent an additional $150 a week to cover my per diem expenses.

38. I often stayed in a cramped hotel room with other Traveling Technicians, and often was required to share a bed or sleep on the floor. Many nights I slept in the living room and did not sleep on a bed.

### EMPLOYMENT

39. ITG required I sign a number of documents in order to work for the company. I felt that if I did not sign the documents, I would not be able to work for ITG.

40. I was only given a few minutes to look at the documents and I did not receive a copy of them after I signed them. I was afraid to ask any questions.

I declare under penalty of perjury under the laws of the State of Florida that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this __30__ day of May, 2019.

*Raphael Parris*
Raphael Parris

---

9
DECLARATION OF RAPHAEL PARRIS

*Monplaisir v. Integrated Tech Group and ITG Communications*,
Case No.: 3:19-cv-01484-WHA