Carolyn Hunt Cottrell (SBN 166977)
Ori Edelstein (SBN 268145)
Michelle S. Lim (SBN 315691)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
ccottrell@schneiderwallace.com
oedelstein@schneiderwallace.com
mlim@schneiderwallace.com

Sarah R. Schalman-Bergen (admitted *pro hac vice*)
Krysten Connon (admitted *pro hac vice*)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
sschalman-bergen@bm.net
kconnon@bm.net

Attorneys for Plaintiff, the Collective,
and putative Class, and Aggrieved Employees on
behalf of the State of California

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL MONPLAISIR, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>INTEGRATED TECH GROUP, LLC and ITG COMMUNICATIONS LLC,<br><br>Defendants. | Case No.: 3:19-cv-01484-WHA<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE MOTION FOR CLASS CERTIFICATION**<br><br>Date:  February 6, 2020<br>Time: 8:00 a.m.<br>Ctrm.: 12, 19th Floor<br><br>Judge: Hon. William Alsup<br><br>Complaint Filed:     March 21, 2019<br>Trial Date:          October 19, 2020 |

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...........................................................................................................................1

II.    BACKGROUND..................................................................................................................2

    A.    ITG and Its Technician Employees. ..................................................................................2

    B.    ITG's Uniform Technician Compensation Model. ..........................................................3

        1.    Calculation of the Technicians' Hourly Rate. ....................................................3

        2.    ITG's Uniform Time Keeping Practices.............................................................4

    C.    ITG's Common Statewide Policy Denies Technicians Compensation for All Hours
        Worked. ............................................................................................................................5

    D.    ITG's Common Statewide Policy and Practice Prevents Technicians From Taking Meal
        and Rest Breaks. ...............................................................................................................7

    E.    ITG's Common Statewide Policy Refusing to Reimburse Technicians for Necessary
        Expenses. ..........................................................................................................................9

    F.    ITG's Common Statewide Policy of Issuing Inaccurate, Incomplete, and
        Incomprehensible Wage Statements. ..............................................................................10

III.   ARGUMENT .....................................................................................................................10

    A.    Legal Standard for Class Certification. ..........................................................................10

    B.    The Class Satisfies the Requirements of Rule 23(a). .....................................................11

        1.    The Class Is So Numerous that Joinder of All Members is Impractical...............11

        2.    Common Questions of Law and Fact Exist. ......................................................12

        3.    Plaintiff's Claims Are Typical of the Class. .......................................................13

        4.    Plaintiff and His Counsel Will Adequately Represent the Class...........................14

    C.    The Requirements of Rule 23(b) – that Common Questions Predominate and that a Class
        Action is Superior – Are Satisfied..................................................................................14

        1.    Common Questions of Law and Fact Predominate Over Individual Issues for All
           California Claims.   ...........................................................................................15

        2.    A Class Action is Superior Method to Adjudicate this Controversy.....................24

IV.   CONCLUSION ...................................................................................................................25

i

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION
*Monplaisir v. Integrated Tech Group and ITG Communications, Case No.: 3:19-cv-01484-WHA*

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                          **Page(s)**

*Abdullah v. U.S. Security Assoc., Inc.*,
731 F.3d 952 (9th Cir. 2013) ............................................................... 23

*Amgen Inc. v. Conn. Ret. Plans and Trust Funds*,
568 U.S. 455 (2013) ............................................................... 11, 16

*Briseno v. ConAgra Foods, Inc.*,
844 F.3d 1121 (9th Cir. 2017) ............................................................... 10, 11

*Brown v. The Hain Celestial Grp., Inc., No. C 11-03082 LB*,
2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ............................................... 15

*Bruton v. Gerber Prods. Co., No. 15-15174*,
2017 WL 1396221 (9th Cir. Apr. 19, 2017) ............................................... 11

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*,
249 F.R.D. 334 (N.D. Cal. 2008) ............................................................... 11-12

*Cardenas v. McLane FoodServices, Inc.*,
796 F.Supp.2d 1246 (C.D.Cal. 2011) ............................................................... 18

*Clemens v. Hair Club for Men, LLC, No. C 15-01431 WHA*,
2016 U.S. Dist. LEXIS 50573 (N.D. Cal. Apr. 14, 2016) ............................... 15

*Delagarza v. Tesoro Refining & Mktg. Co.*,
No. C--09--5803 EMC, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) ................... 16

*Dilts v. Penske Logistics, LLC*,
267 F.R.D. 625 (S.D. Cal. 2010) ............................................................... 24

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................... 13, 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
308 F.R.D. 606 (N.D. Cal. 2015) ............................................................... 15

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006)........................... 13

*In re Lenovo Adware Litig.*,
No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ................... 15

*Joseph v. Gen. Motors Corp.*,
109 F.R.D. 635 (D. Colo. 1986) ............................................................... 11

*Lilly v. Jamba Juice Co.*,
308 F.R.D. 231 (N.D. Cal. 2014) ............................................................... 11

*Mazza v. Am. Honda Motor Company, Inc.*,
666 F.3d 581 (9th Cir. 2012) ............................................................... 12

*Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.),*
571 F.3d 953 (9th Cir. 2009) ................................................................................. 16

*Mullins v. Premier Nutrition Corp.,*
No. 13-cv-01271-RS, 2016 U.S. Dist. LEXIS 51140, (N.D. Cal. Apr. 15, 2016).................................. 14, 25

*Opperman v. Path, Inc.,*
No. 13-cv-00453-JST, 2016 U.S. Dist. LEXIS 92403 (N.D. Cal. July 15, 2016) ......................... 25

*Parsons v. Ryan,*
754 F.3d 657 (9th Cir. 2014) ................................................................................. 12

*Richardson v. Interstate Hotels & Resorts, Inc.,*
No. C 16-06772 WHA, 2018 U.S. Dist. LEXIS 40377 (N.D. Cal. Mar. 12, 2018) ................... 19, 20, 21, 23

*Ries v. Ariz. Bevs. USA LLC,*
287 F.R.D. 523 (N.D. Cal. 2012)............................................................................ 14

*Rutti v. Lojack Corp., Inc.,*
596 F.3d 1046 (9th Cir. 2010) ............................................................................... 16, 17

*Saechao v. Landry's Inc.,*
No. C 15-00815 WHA, 2016 U.S. Dist. LEXIS 33409 (N.D. Cal. Mar. 15, 2016) .................... 22

*Swamy v. Title Source, Inc.,*
2018 U.S. Dist. LEXIS 57048 ................................................................................. 24

*Tyson Foods, Inc. v. Bouaphakeo,*
136 S. Ct. 1036 (2016) .......................................................................................... 15

*Wahl v. Am. Sec. Ins. Co.,*
No. C 08-00555 RS, 2010 U.S. Dist. LEXIS 54637 (N.D. Cal. May 10, 2010) ......................... 15

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011)........................................................................................ 11, 12, 13, 20

*Wang v. Chinese Daily News, Inc.,*
737 F.3d 538 (9th Cir. 2013) ................................................................................. 15

**State Cases**

*Armenta v. Osmose, Inc.,*
135 Cal. App. 4th 314 (2005) ................................................................................. 16

*Augustus v. ABM Security Services, Inc.,*
2 Cal. 5th 257 (2016) ........................................................................................... 19, 21

*Brinker Restaurant Corp v. Superior Court,*
273 Cal. 4th 1004 (2012) ...................................................................................... 19, 20, 21, 22

*Jaimez v. DAIOHS USA, Inc.,*
181 Cal.App.4th 1286–1305 (2010) ....................................................................... 20, 23

**State Statutes**

California Labor Code Section 2802 ......................................................................... 23

California Labor Code Section 226.2(a) ................................................................... 22, 23, 24

**Additional Authorities**

2002 Division of Labor Standards Enforcement Policies and Interpretations Manual ............................ 18, 23

29 C.F.R. Section 778.111 ............................................................................................... 18

Cal. Code Regs., tit. 8, § 11040, subd. (2)(K) ................................................................. 16

Fed. R. Civ. P. 23 ....................................................................................................... *passim*

## I.   **INTRODUCTION**

Plaintiff Paul Monplaisir seeks to certify the claims of the following California Class:

> All current and former non-exempt hourly employees of ITG working as Technicians throughout the State of California from March 21, 2015 until the resolution of this action (the "Class").

Plaintiff and the proposed Class members worked as Technicians carrying out ITG's[1] cable installation services throughout the State of California. During the course of their employment, these Technicians were subjected to numerous common policies and practices that violate the California Labor Code. Plaintiff contends that ITG eschewed its obligations under California law by: (1) failing to pay proper minimum wage, overtime wages, and completed piece rates; (2) failing to provide a reasonable opportunity to take meal and rest periods, and failing to properly compensate Class members when such meal and rest periods were not taken; (3) failing to reimburse necessarily-incurred business expenses; and (4) failing to issue accurate, itemized wage statements.

The claims arising from ITG's conduct are perfectly suited for class-wide adjudication. The evidence is clear that these claims arise from ITG's implementation and maintenance of the following common statewide policies and practices. First, the failure to pay proper minimum wage and overtime wages resulted from ITG's policies and practices of not compensating Technicians for all time spent driving ITG trucks, and from ITG's practice of pressuring Technicians to underreport their hours and to omit completed piece rates. Second, ITG prevented Technicians from taking meal and rest periods by failing to have adequate meal and rest policies and by overscheduling Technicians throughout the day leaving no time for Technicians to take meal or rest breaks. Third, ITG as a matter of practice, failed to reimburse necessary business expenses. Fourth, ITG issued wage statements that did not disclose completed or compensated piece-rates, and otherwise made it impossible for Technicians to know how they were compensated.

---

[1] ITG refers to Defendants Integrated Tech Group, LLC and ITG Communications, LLC. Despite initially denying that Integrated Tech Group employed any Technicians in California, at the 30(b)(6) depositions, Defendants stipulated on the record that for purposes of this litigation only, Defendants would no longer dispute that both Integrated Tech Group and ITG Communications were employers of Plaintiff, the Class, and the Collective. Declaration of Michelle S. Lim ("Lim Decl."), Ex. A, Deposition of Elizabeth Smith, at 119:22-120:18.

1   The common policies and practices forming the basis for ITG's liability are shown by the

2   declarations of ten Class Members, ITG's written policies, and the deposition testimony of

3   Defendants' 30(b)(6) corporate witnesses, including their VP of Operations, their Human Resources

4   Manager, and their Corporate Services Manager.

5   **II.    BACKGROUND**

6       **A.  ITG and Its Technician Employees.**

7   ITG provides cable and communication equipment installations on behalf of cable operators

8   – primarily, Comcast Corporation – throughout the State of California.[2] To carry out its installation

9   services, ITG employs approximately 100 "Technicians" in California who are classified as non-

10  exempt and are compensated on a hybrid hourly and piece-rate basis.[3] Plaintiff Paul Monplaisir

11  worked as one such Technician for ITG in California between March 2018 and June 2018.[4]

12  Technicians' job duties, working hours and conditions, as well as ITG's compensation

13  model, are the same or substantially similar throughout the State of California.[5] Technicians' duties

14  include but are not limited to: driving an ITG truck to customers' residences; installing cable,

15  telephone, and internet service; making repairs; troubleshooting; and educating customers.[6]

16  Technicians' workdays typically start prior to 7:00 a.m., which includes receiving their first

17  assignments of the day, performing a safety check of ITG's vehicles, and determining whether they

18

19

---

20  [2] *See* ECF 39, First Amended Class and Collective Action Complaint ("Compl."), ¶ 24; Lim Decl., Ex. A, Deposition of Gissel Rivera ("Rivera Dep."), at 31:1-7, 43:8-44:12.

21  [3] *See* Compl., ¶¶ 48-49; Lim Decl., Ex. C, Deposition of Katie Tisdale ("Tisdale Dep.") at 70:6-71:5; Rivera Dep. at 33:18-20; 85:12-14; 102:14-17; Lim Decl., Ex. D, Deposition of Jerry Taylor

22  ("Taylor Dep.") at 61:8-17, 131:15-20; Lim Decl., Ex. O ("Monplaisir Decl."), ¶¶2-4; Lim Decl., Ex. P ("Alberto Decl."), ¶¶2-4; Lim Decl., Ex. Q ("Prophete Decl."), ¶¶2-4; Lim Decl., Ex. R

23  ("Cajuste Decl.") ¶¶2-4; Lim Decl., Ex. S ("Jean Decl.") ¶¶2-4; Lim Decl., Ex. T ("Obilas Decl.") ¶¶2-4; Lim Decl., Ex. U ("St. Germain Decl.") ¶¶2-4; Lim Decl., Ex. V ("Parris Decl."), ¶¶2-4; Lim

24  Decl., Ex. W ("Mills Decl.") ¶¶2-4; Lim Decl., Ex. X ("Cason Decl.") ¶¶2-4.

25  [4] *See* Compl., ¶ 17; Monplaisir Decl. ¶¶2-4.
    [5] *See* Compl., ¶ 26, 63; Tisdale Dep. at 27:22-28:18; 28:23-29:17; 32:1-33:16; 74:10-18, 94:10-18,

26  113:10-19; 118:15-19, 261:1-4, 261:14-15.
    [6] *See* Compl., ¶¶ 26; Alberto Decl. ¶5; Prophete Decl. ¶5; Cajuste Decl. ¶5; Monplaisir Decl. ¶5;

27  Jean Decl. ¶5; Obilas Decl. ¶5; St. Germain Decl. ¶5; Parris Decl. ¶5; Mills Decl. ¶5; Cason Decl. ¶5.; Tisdale Dep. at 27:22-25; 28:15-18; 28:23-29:6; 32:1-3; Rivera Dep. 62:13-18; Lim Decl., Ex.

28  F ("Ex. F").

---

1  need additional equipment.[7] Technicians then either drive their ITG truck to the ITG warehouse if

2  they need to pick up supplies, or directly to their first job assignment. If they are going to the

3  warehouse, Technicians typically arrive there by 7:00 a.m.[8]

4        Technicians typically work five to seven days per week, and upwards of ten hours per day.[9]

5  On each day they work, Technicians are generally assigned at least six jobs, usually scheduled in

6  two-hour blocks, though sometimes Technicians are scheduled for more than one job during a two-

7  hour period, forcing Technicians to run behind schedule.[10] Each job entails one or more tasks, *e.g.*,

8  installing a cable, setting up internet service, and/or creating an electrical outlet.[11] Jobs vary in

9  length  to complete, however, some jobs can take an entire day.[12] Once a Technician completes a

10 job, they drive to their next job, which can take between 20 minutes to over an hour.[13] Technicians

11 are required to arrive at their next job within the job's scheduled time block.[14]

12     **B.  ITG's Uniform Technician Compensation Model.**

13        **1.  Calculation of the Technicians' Hourly Rate.**

14       ITG compensates its Technicians utilizing the same hybrid piece-rate and hourly

15 compensation plan for all Technicians.[15] Initially, Technicians received an hourly rate that was

16 calculated by comparing the Technician's total production for the week (each assignment was made

17 up of various job codes which corresponded to a production value and the total production was the

18

19 [7] *See* Compl., ¶ 29; Alberto Decl. ¶¶6-7; Prophete Decl. ¶¶6-7, 10; Cajuste Decl. ¶¶6-7, 10; Monplaisir Decl. ¶¶6-7, 10; Jean Decl. ¶¶6-7, 10; Obilas Decl. ¶¶6-7, 10; St. Germain Decl. ¶¶6-7, 10; Parris Decl. ¶¶6-7, 10; Mills Decl. ¶¶6-7, 10; Cason Decl. ¶¶6-7, 10.

20 [8] *See* Alberto Decl. ¶7; Prophete Decl. ¶7; Cajuste Decl. ¶7; Monplaisir Decl. ¶7; Jean Decl. ¶7; Obilas Decl. ¶7; St. Germain Decl. ¶7; Mills Decl. ¶7. *See also,* Lim Decl., Ex. G ("Ex. G"), at

21 ITG_000172; Lim Decl., Ex. H ("Ex. H"); Tisdale Dep. at 112:11-24, 169:3-14.

[9] *See* Compl., ¶ 5; Alberto Decl. ¶19; Prophete Decl. ¶18; Cajuste Decl. ¶19; Monplaisir Decl. ¶19;

22 Jean Decl. ¶19; Obilas Decl. ¶19; St. Germain Decl. ¶16; Parris Decl. ¶18; Mills Decl. ¶18; Cason Decl. ¶19. *See also,* Rivera Dep. at 128:5-7.

23 [10] Compl., ¶¶ 32, 34; Alberto Decl. ¶¶11-15; Prophete Decl. ¶¶11-15; Cajuste Decl. ¶¶11-15; Monplaisir Decl. ¶¶11-15; Jean Decl. ¶¶11-15; Obilas Decl. ¶¶11-15; St. Germain Decl. ¶¶11-12;

24 Parris Decl. ¶¶11-15; Mills Decl. ¶¶11-15; Cason Decl. ¶¶11-15.

[11] *See* Tisdale Dep. at 49:18-23, 50:2-18.

25 [12] Alberto Decl. ¶11; Prophete Decl. ¶11; Cajuste Decl. ¶11; Monplaisir Decl. ¶11; Jean Decl. ¶11; Obilas Decl. ¶11; St. Germain Decl. ¶11; Parris Decl. ¶11; Mills Decl. ¶11; Cason Decl. ¶11.

26 [13] Alberto Decl. ¶15; Prophete Decl. ¶15; Cajuste Decl. ¶15; Monplaisir Decl. ¶15; Jean Decl. ¶15; Obilas Decl. ¶15; St. Germain Decl. ¶12; Parris Decl. ¶15; Mills Decl. ¶15; Cason Decl. ¶15.

27 [14] *See* Tisdale Dep. at 248:7-249:18.

28 [15] *See* Taylor Dep. at 85:13-87:14; Ex. I ("Ex. I"); Tisdale Dep. at 72:20-73:24, 74:7-18, 94:10-18.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION
*Monplaisir v. Integrated Tech Group and ITG Communications, Case No.: 3:19-cv-01484-WHA*

sum of the job codes completed) to the total hourly compensation.[16] If the production was higher than the Technician earned the production rate, and if the total hourly was higher he or she earned the hourly rate.[17]

In or around the early part of 2018, ITG modified its piece-rate system, and Technicians began receiving an hourly rate that ITG calculates using a "work order completion bonus" scheme, which combines a set hourly rate with a piece-rate component based on the unit value of the work orders completed by the Technician in a specific week.[18] Each job, has a corresponding number of "units" or "points" per task, otherwise known as the unit value.[19] A Technician earns a job's unit value – preset numbers assigned by Comcast based on the size of the work orders – by performing the various jobs and tasks on the work order.[20] The total unit values for the week are then multiplied by a preset monetary rate to determine the unit pay of that week, which is then added to the Technician's total hourly pay, which is usually based on the minimum wage.[21] The resulting number is then divided by the total hours worked that week to obtain the applicable hourly rate paid to Technicians. That new rate is then used as the regular rate of pay and used to calculate the overtime rate applicable to all overtime hours for that week.[22]

### 2. ITG's Uniform Time Keeping Practices.

ITG follows the same uniform practice regarding tracking time worked for all Technicians.[23] Throughout the day, Technicians clock-in and out, through a mobile app on their handheld device.[24] Technicians' supervisors, as well as ITG's billing department audit the time records and compare

---

[16] *See* Tisdale Dep. at 79:4-21, 81:4-18, 86:10-18; Taylor Dep. at 143:14-24, 144:4-11. According to ITG's 30(b)(6) witness, at some point, all Technicians were paid by job codes instead of units. *See* Taylor Dep. at 86:8-11.
[17] Rivera Dep. at 140:19-21.
[18] *See* Ex. I; Tisdale Dep. at. 95:14-96:1.
[19] *See* Rivera Dep. at 144:22-146:16.
[20] *See id.*; Tisdale Dep. at 79:12-81:18.
[21] *See* Ex. I; Tisdale Dep. at 71:2-5, 79:12-81:18.
[22] *See* Ex. I. The new hourly rate is the rate reflected on Technicians' pay stubs for the week. *See* Rivera Dep. at 102:14-17; Tisdale Dep. at 81:8-18.
[23] *See* Rivera Dep. at 91:10-15; Tisdale Dep. at 36:22-37:10, 39:4-19.
[24] Rivera Dep. at 51:9-15, 22-25, 91:10-15; Taylor Dep. at 21:10-11, 101:25-102:8; Tisdale Dep. at 39:8-19.

them to the daily work orders.[25] The audit process involves comparing the work orders to their customer's database, which contains information about what the customer ordered, as well as information about the residence at which service was performed.[26] When Technicians' work orders contain piece-rate entries that are not "correctly" coded according to ITG standards, ITG deletes or lowers piece-rates to be more consistent with the information in their customer's database.[27] When Technicians' time records show that Technicians are clocked in while not located at a job site, the Billing Department will instruct the Technicians to modify these time records to be consistent with when they believe the Technicians were actually working.[28] These timecard changes result in deleted piece rates, modified piece rates, and changes to the number of hours worked.[29]

### C. ITG's Common Statewide Policy Denies Technicians Compensation for All Hours Worked.

ITG implemented and maintains policies and practices that prevent Technicians from being compensated for all time worked. This outcome results from three uniform practices by ITG: (1) requiring Technicians to perform work off-the-clock, (2) pressuring Technicians to underreport their hours, and (3) improperly charging Technicians for incurred business expenses. These common issues predominate the claims for minimum wage and overtime compensation.

First, ITG does not compensate Technicians for all hours worked because Technicians perform work off-the-clock. It is ITG's policy not to compensate its Technicians for the time spent driving to the warehouse or the first job site, and from the last job site.[30] This is despite the fact that

---

[25] Tisdale Dep. at 51:23-54:24, 243:25-244:11; Taylor Dep. at 136:11-137:2.

[26] *See* Tisdale Dep. at 51:23-53:17, 54:11-24, 97:25-99:2, 266:20-267:22; Rivera Dep. at 118:5-119:19; 124:2-125:24; 127:15-128:3.

[27] *See* Rivera Dep. at 151:14-153:4. Since approximately May or June 2019, ITG now regularly compares Technicians' time records through GPS records tracking the locations of company-owned vehicles driven by Technicians. Tisdale Dep. at 51:23-53:17, 54:20-24, 98:14-100:16; Taylor Dep. at 138:7-23; *see also,* Lim Decl., Ex. J ("Ex. J"); Tisdale Dep. at 149:11-17, 150:13-18. Prior to this practice, ITG tracked the GPS of its Technicians, but not on a daily basis. Rivera Dep. at 133:14-25.

[28] *See supra,* n. 26.

[29] *See supra,* n. 27-28. *See also,* Alberto Decl. ¶¶30-32; Prophete Decl. ¶¶30-32; Cajuste Decl. ¶¶31-33; Monplaisir Decl. ¶¶31-33; Jean Decl. ¶¶31-32; Obilas Decl. ¶¶31-33; St. Germain Decl. ¶¶27-29; Parris Decl. ¶¶27-29; Mills Decl. ¶¶27-29; Cason Decl. ¶¶29-31.

[30] Lim Decl., Ex. K ("Ex. K"), at ITG_000052 ("ITG does NOT pay for commute time to and from work"). *See* Tisdale Dep. at 125:19-21; *see also,* Tisdale Dep. at 118:15-19. In November 2018, ITG modified its policy to provide that Technicians "must clock in the moment [they] leave [their] hotel/home to drive to [their] first job." Ex. H. Technicians testify that this policy was either never

---

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION
*Monplaisir v. Integrated Tech Group and ITG Communications, Case No.: 3:19-cv-01484-WHA*

1 Technicians drive ITG trucks pursuant to ITG's uniform driving policies.[31] ITG's driving policy

2 prohibits Technicians from having passengers in the vehicle at any time, from using the vehicle for

3 personal use, from driving the vehicle during unauthorized hours,[32] or from modifying the vehicle

4 in any way.[33] These company-owned vehicles are equipped with a Drive Cam (a video camera that

5 tracks GPS, ignition activity, and speeding) and Cell Control (which blocks Technician's access to

6 their cell phones while the car is moving).[34] Through the Drive Cam and Cell Control, ITG

7 monitors Technicians anytime they drive the ITG truck to ensure compliance with ITG's driving

8 policy.[35] Violations of that policy subjects Technicians to disciplinary action, up to and including

9 termination.[36]

10        Second, ITG fails to compensate Technicians for all hours worked because it instructs and

11 pressures Technicians to underreport their hours.[37] ITG prohibits Technicians from clocking-in

12 prior to 7:00 a.m. and requires them to clock-out at the completion of their last job (except under

13 certain circumstances).[38] Since 2014, ITG's policy concerning work time instructs Technicians to

14 begin work at 7:00 a.m. or during the performance of "any service designated by ITG," and to end

15 work at the end of their shift, or after performance of "any service designated by ITG," without

16 explaining what such services could include.[39] This causes Technicians to report starting work at

17

18 [implemented], or was only implemented for a few weeks. *See* Alberto Decl. ¶¶6-9, 17; Prophete Decl. ¶¶6-10, 16; Cajuste Decl. ¶¶6-10, 17; Monplaisir Decl. ¶¶6-10, 17; Jean Decl. ¶¶6-10, 17;

19 Obilas Decl. ¶¶6-10, 17; St. Germain Decl. ¶¶6-10, 14; Parris Decl. ¶¶6-10, 17; Mills Decl. ¶¶6-10, 16; Cason Decl. ¶¶6-10, 17-18.

20 [31] Alberto Decl. ¶7; Prophete Decl. ¶7; Cajuste Decl. ¶7; Monplaisir Decl. ¶7; Jean Decl. ¶7; Obilas Decl. ¶7; St. Germain Decl. ¶7; Parris Decl. ¶7; Mills Decl. ¶7; Cason Decl. ¶7

21 [32] *See* Ex. K, at ITG_000081 (Technicians' hours of usage of company owned vehicles is 5:01 a.m. to 9:59 p.m.).

22 [33] Ex. K, at ITG_000075-76.
[34] *See* Ex. J; Lim Decl., Ex. L ("Ex. L"), at ITG_000220; Taylor Dep. at 163:2-4. *See also,* Tisdale

23 Dep. at 190:7-15.
[35] Ex. K, at ITG_000075; Ex. L at ITG_000221.

24 [36] *See supra,* n. 35.
[37] Alberto Decl. ¶¶16, 18, 29-32; Prophete Decl. ¶¶17, 29-32; Cajuste Decl. ¶¶16, 30-33; Monplaisir

25 Decl. ¶¶16, 30-33; Jean Decl. ¶¶16, 29-32; Obilas Decl. ¶¶16, 30-33; St. Germain Decl. ¶¶13, 26-29; Parris Decl. ¶¶16, 26-29; Mills Decl. ¶¶17, 26-29; Cason Decl. ¶¶18, 29-32.

26 [38] Ex. L at ITG_000194; Lim Decl., Ex. M ("Ex. M") at ITG_000135; *see also* Ex. K at ITG_000053, Rivera Dep. at 170:3-24.

27 [39] Ex. J; Lim Decl., Ex. N ("Ex. N") at ITG_000129 ; Ex. M at ITG_000133; Ex. K at ITG_000051-52; Ex. L at ITG_000206; Ex. G at ITG_000171; Ex. H. ITG's policies did not explain what it

28 meant by "service as designated by ITG." Tisdale Dep. at 124:11-125:18; 151:17-152:12.

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION
*Monplaisir v. Integrated Tech Group and ITG Communications, Case No.: 3:19-cv-01484-WHA*

7:00 a.m. in order to comply with ITG's policy even when they preform work before that time.[40]

In addition, ITG's supervisors and managers purposefully mislead Technicians into believing that if they report fewer hours they will earn more money.[41] Technicians understand that this was done in order to demonstrate higher levels of productivity to ITG's clients.[42] Thus, when Technicians do not underreport their hours to ITG's satisfaction, ITG changes the time entries on Technician time cards to reflect that Technicians worked fewer hours than they did.[43]

Finally, Technicians are not paid for all hours they work because ITG deducts multiple items from Technicians' paychecks, including for tools, equipment, damages to a customer's home up to $500, or chargebacks for unsatisfactory or incorrectly coded work.[44] These uniform practices apply to Technicians throughout California.[45]

### D. ITG's Common Statewide Policy and Practice Prevents Technicians From Taking Meal and Rest Breaks.

The uniform manner in which ITG denies Technicians meal periods results from common practices. As a matter of common practice, ITG overschedules Technicians and pressures them to meet specific job window timeframes. *See supra*, Section II.A, n. 9-14. As a natural consequence of

---

[40] Technicians' morning and evening work pre- and post-shift can include:  checking their jobs for the day, assessing their equipment, ensuring the safety of their vehicles, driving to either the warehouse or their first jobs, waiting for and gathering equipment, attending meetings; reconciling inventory, and driving from their last job. *See* Alberto Decl. ¶¶6-9, 17; Prophete Decl. ¶¶6-10, 16; Cajuste Decl. ¶¶6-10, 17; Monplaisir Decl. ¶¶6-10, 17; Jean Decl. ¶¶6-10, 17; Obilas Decl. ¶¶6-10, 17; St. Germain Decl. ¶¶6-10, 14; Parris Decl. ¶¶6-10, 17; Mills Decl. ¶¶6-10, 16; Cason Decl. ¶¶6-10, 17-18.

[41] Alberto Decl. ¶¶16, 18, 29-32; Prophete Decl. ¶¶17, 29-32; Cajuste Decl. ¶¶16, 30-33; Monplaisir Decl. ¶¶16, 30-33; Jean Decl. ¶¶16, 29-32; Obilas Decl. ¶¶16, 30-33; St. Germain Decl. ¶¶13, 26-29; Parris Decl. ¶¶16, 26-29; Mills Decl. ¶¶17, 26-29; Cason Decl. ¶¶18, 29. *See also,* Tisdale Dep. at 160:13-25 ("the more you complete, the higher the production is, so your bonus could potentially be high and raise your hourly rate").

[42] Alberto Decl. ¶16; Cajuste Decl. ¶16; Monplaisir Decl. ¶16; Jean Decl. ¶16; Obilas Decl. ¶16; St. Germain Decl. ¶13; Parris Decl. ¶16; Cason Decl. ¶16; *see also* Ex. L at ITG_000205.

[43] Alberto Decl. ¶¶10, 16, 18, 29-32; Prophete Decl. ¶¶10, 17, 29-32; Cajuste Decl. ¶¶10, 16, 18, 30-33; Monplaisir Decl. ¶¶10, 16, 18, 30-33; Jean Decl. ¶¶10, 16, 29-32; Obilas Decl. ¶¶10, 16, 18, 30-33; St. Germain Decl. ¶¶10, 13, 15, 26-29; Parris Decl. ¶¶10, 16, 26-29; Mills Decl. ¶¶10, 17, 26-29; Cason Decl. ¶¶10, 16, 29-32.

[44] *See* Ex. J (deductions include tools, equipment, or damages); Ex. M at ITG_000132 ("chargebacks will be taken from the employee for unsatisfactory or incorrectly coded work"); Ex. K at ITG_000058 (same); Tisdale Dep. at 219:14-220:23. *See also,* Lim Decl. Ex. E, Rough Transcript of Deposition of Jerry Taylor, at pp. 119-121, 124-126.

[45] *See* Tisdale Dep. at 118:15-19, 149:11-17, 150:13-18; Rivera Dep. at 170:3-24.

1    Technicians' overwhelming workload, and ITG's constant pressure to complete all daily job

2    assignments, Technicians are systematically denied the opportunity to take compliant meal and rest

3    breaks.[46]

4        In addition to the pressure exerted to meet the schedule, ITG did not, and still does not, have

5    a policy or practice to provide Technicians with legally compliant meal or rest breaks. Prior to

6    2019, ITG provided Technicians with vague "policies" stating that they were required to take an

7    unpaid 30 minute meal break, but never explained what constitutes a timely break, that the rest

8    break must be off-duty, what it means to be off-duty, and the consequence of being unable to take a

9    meal break.[47] These policies also did not provide for a second meal period when a Technician

10    worked over ten hours in a day.[48] Indeed, Technicians report that they were not provided a second

11    meal period when they worked over ten hours.[49]

12        These pre-2019 policies were similarly vague with respect to rest breaks. ITG did not

13    explain what constituted a rest break, that the rest break must be off-duty, or the consequences of

14    being unable to take a rest break.[50] It was ITG's policy that it was the Technicians' responsibility to

15    take meal and rest breaks – even if the workload did not afford time to take a break.[51] But because

16

---

17 [46] Alberto Decl. ¶¶20-25; Prophete Decl. ¶¶19-24; Cajuste Decl. ¶¶20-25; Monplaisir Decl. ¶¶20-25; Jean Decl. ¶¶20-25; Obilas Decl. ¶¶20-25; St. Germain Decl. ¶¶17-22; Parris Decl. ¶¶19-23; Mills Decl. ¶¶19-23; Cason Decl. ¶¶20-25.

18 [47] *See* Ex. K at ITG_00051 ("All employees are required to take an unpaid, 30-minute lunch break

19 during their normal business day."); Ex. J (same); Ex. N at ITG_000129 ("Non- [sic] All employees are required to take an unpaid, 30-minute lunch break during their normal business day."); Ex. M at

20 ITG_000133 (same). *Cf.* Ex. G at ITG_000171 (2018 document explaining when meal breaks should be taken, but not the consequences of being unable to take a meal break). Notably, Class

21 members confirm the lack of a compliant policy indicating that, even when Technicians actually took a meal break, they were required to be available by cell phone to respond to any work calls.

22 Alberto Decl. ¶¶20-23; Prophete Decl. ¶¶19-22; Cajuste Decl. ¶¶20-23; Monplaisir Decl. ¶¶20-23; Jean Decl. ¶¶20-23; Obilas Decl. ¶¶20-23; St. Germain Decl. ¶¶17-20; Parris Decl. ¶¶19-21; Mills

23 Decl. ¶¶19-21; Cason Decl. ¶¶20-23.
[48] *See supra* n. 47.

24 [49] Alberto Decl. ¶¶20-25; Prophete Decl. ¶¶19-24; Cajuste Decl. ¶¶20-25; Monplaisir Decl. ¶¶20-25; Jean Decl. ¶¶20-25; Obilas Decl. ¶¶20-25; St. Germain Decl. ¶¶17-22; Parris Decl. ¶¶19-23;

25 Mills Decl. ¶¶19-23; Cason Decl. ¶¶20-25.
[50] *See* Ex. K at ITG_000051-52; Ex. M at ITG_000134.

26 [51] *See* Alberto Decl. ¶¶20-25; Prophete Decl. ¶¶19-24; Cajuste Decl. ¶¶20-25; Monplaisir Decl. ¶¶20-25; Jean Decl. ¶¶20-25; Obilas Decl. ¶¶20-25; St. Germain Decl. ¶¶17-22; Parris Decl. ¶¶19-

27 23; Mills Decl. ¶¶19-23; Cason Decl. ¶¶20-25. ITG also does not and has not recorded any rest breaks taken by its Technicians, and instead places the burden on each employee to take rest breaks

28 and to report whether they had not taken any such break. Rivera Dep. at 111:1-112:19. Because

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CLASS CERTIFICATION
*Monplaisir v. Integrated Tech Group and ITG Communications, Case No.: 3:19-cv-01484-WHA*

ITG packs Technician schedules and does not factor in the need to take meal or rest breaks, Technicians are not provided a reasonable opportunity to take meal or rest breaks.[52]

In late 2018[53] ITG issued a "Meal Periods and Start/End Time Memo," in which it indicated that meal periods were to be taken before the end of the fifth hour of work and that Technicians were entitled to a second meal period before the end of the 10th hour of work.[54] The updated policy still mandates that "Employees are responsible for scheduling their own meal periods in consultation with their supervisor…"[55]

### E. ITG's Common Statewide Policy Refusing to Reimburse Technicians for Necessary Expenses.

To perform their basic job duties, Technicians must purchase items such as tools and clothing – including drills, drill bits, cellular phones, boots, and pants.[56] As a matter of statewide practice, ITG generally does not reimburse Technicians for these necessary expenses.[57] While ITG does have a expense reimbursement policy, as a matter of practice, that policy does not cover the tools Technicians use.[58] Even considering the expense reimbursement policy, which was not applicable to Technicians,[59] it places two improper criteria on the reimbursement process. First, business expenses are only reimbursable if the Technicians timely submit them within 90 days.[60] Second, Technicians cannot get reimbursed unless they get prior written approval from their

---

ITG's policies makes no mention of the need to report missed breaks, it is unsurprising that **no Technician** has ever reported that they did not take a rest break. *See id.* at 112:17-19.

[52] *See supra,* n. 51. Notably, ITG concedes that prior to early 2019, ITG did not pay or even know about the requirement to pay premium compensation for missed and noncompliant meal and rest breaks.  Taylor Dep. at 41:22-42:19, 46:16-19.

[53] Notably, this update was undertaken following notice of Plaintiff's claims in this action.

[54] Ex. G at ITG_000171.

[55] *See id.*

[56] *See* Compl., ¶¶ 7, 9; Alberto Decl. ¶26; Prophete Decl. ¶¶25-26; Cajuste Decl. ¶¶26-27; Monplaisir Decl. ¶¶26-27; Jean Decl. ¶26; Obilas Decl. ¶¶26-27; St. Germain Decl. ¶23; Parris Decl. ¶¶24-25; Mills Decl. ¶¶24-25; Cason Decl. ¶¶26-28.

[57] *See* Alberto Decl. ¶26, 34; Prophete Decl. ¶¶25-26, 34; Cajuste Decl. ¶¶26-27, 35; Monplaisir Decl. ¶¶26-27, 35; Jean Decl. ¶26, 34; Obilas Decl. ¶¶26-27, 35; St. Germain Decl. ¶23, 31; Parris Decl. ¶¶24-25; Mills Decl. ¶¶24-25; Cason Decl. ¶¶26-28.

[58] *See supra,* n. 57.

[59] *See* Tisdale Dep. at 130:22-131:15.

[60] Ex. K at ITG_000061, 000064.

Manager.[61]

### F.  ITG's Common Statewide Policy of Issuing Inaccurate, Incomplete, and Incomprehensible Wage Statements.

Uniformly and statewide, ITG does not provide accurate, itemized wage statements as required by California law. This is not simply a derivative claim, but instead is based on ITG's failure to show the final result of their manipulated and convoluted compensation scheme on Technician's wage statements.[62] Despite paying a piece-rate, the wage statements ITG provides to Technicians do not distinguish between compensation for nonproductive versus productive time nor does it reveal the number of hours each Technician has expended on production or non-production activities, including rest and recovery periods.[63] ITG's wage statements also do not show the piece rates that were accepted for compensation, or the value of the completed piece rates.[64] By design, Technicians are prevented from knowing how they are compensated for productive and non-productive time, and at what rate.[65] These wage statement policies are uniform throughout the State of California.[66]

## III.  <u>ARGUMENT</u>

### A.  Legal Standard for Class Certification.

A party seeking class certification must satisfy the four requirements of Rule 23(a): "numerosity, commonality, typicality, and adequacy" and "at least one of the requirements of Rule 23(b)." *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1124 (9th Cir. 2017). The party seeking class certification must show by "a preponderance of the evidence" these requirements are met.

---

[61] *See id.*
[62] Of course, Plaintiff contends that because ITG failed to pay Technicians for all hours worked, provide proper overtime compensation, or provide meal and rest periods, the wage statements, as a result, are not compliant with California law.
[63] Tisdale Dep. at 109:14-17, 218:20-24, 222:11-20, 242:19-22.
[64] Tisdale Dep. at 222:11-20. ITG may argue that Technician's paystubs are not the complete wage statements. Specifically, ITG will argue that Technicians are able to access unit values on their phone applications – documents that do show the piece rates for which Technicians were completed. However, such data simply is not part of the wage statements. These documents are never provided together. *See id.*
[65] *See* Alberto Decl. ¶¶29-32; Prophete Decl. ¶¶29-32; Cajuste Decl. ¶¶30-33; Monplaisir Decl. ¶¶30-33; Jean Decl. ¶¶29-32; Obilas Decl. ¶¶30-33; St. Germain Decl. ¶¶26-29; Parris Decl. ¶¶26-29; Mills Decl. ¶¶26-29; Cason Decl. ¶¶29-32.
[66] *See id.* at 109:14-17, 218:20-24, 222:11-20, 242:19-22.

*Lilly v. Jamba Juice Co.,* 308 F.R.D. 231, 236 (N.D. Cal. 2014). Courts "should err in favor of, and not against, the maintenance of the class action" because class certification "is subject to later modification." *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 638 (D. Colo. 1986) (citing *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968), cert. denied, 394 U.S. 928 (1969)). While "a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds,* 568 U.S. 455, 466 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 at 350 (2011)). "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## B.  The Class Satisfies the Requirements of Rule 23(a).

Fed. R. Civ. P. 23(a) provides that a district court may certify a class if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." The proposed Class satisfies each of these elements.[67]

### 1.  The Class Is So Numerous that Joinder of All Members is Impractical.

Fed. R. Civ. P. 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impractical." While there is no fixed number that satisfies the numerosity requirement, as a general matter, a class greater than forty often satisfies the requirement, while one less than twenty-one does not." *See Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249

---

[67] In the past, some courts have implied an additional threshold requirement: that the class be ascertainable or that there be an administratively feasible way to determine who is in the class. But recently, the Ninth Circuit has made it clear that Rule 23 does not require such a showing. *See Briseno*, 844 F.3d at 1124-25 ("We have not previously interpreted Rule 23 to require such a demonstration [that there is an administratively feasible way to determine who is in the class], and . . . we do not do so now."); *accord Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 WL 1396221, at *1 (9th Cir. Apr. 19, 2017). But nevertheless, any ascertainability requirement would be satisfied here because the Class is defined with objective criteria allowing Class Members to easily be identified by reference to Defendants' records of who was employed by Defendants during the defined time period.

F.R.D. 334, 346 (N.D. Cal. 2008). According to data provided by Defendant, there are approximately 100 members in the proposed Class.[68] Thus, joinder of all members would be impractical, and numerosity is satisfied.

### 2. Common Questions of Law and Fact Exist.

Fed. R. Civ. P. 23(a)(2) requires that there be "questions of law or fact common to the class." This requires Plaintiff to show that a class wide proceeding can "generate common answers apt to drive the resolution of the litigation." *See Dukes,* 564 U.S. 338, 350. The required showing imposes only a "limited burden." *Mazza v. Am. Honda Motor Company, Inc.*, 666 F.3d 581, 589 (9th Cir. 2012). So "long as there is even a single common question, a would-be class can satisfy" commonality. *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (citation and internal quotation marks omitted).

This case involves numerous common questions of law and fact that can be answered for all Class members in a single stroke. The common questions in this case include but are not limited to:

- Whether ITG Technicians are compensated on a piece-rate basis;

- Whether ITG exerts control over Technicians while they are driving company-owned vehicles such that Technicians' should be compensated for pre- and post-shift driving;

- Whether ITG has a policy or practice of deleting or lowering piece-rates submitted by Technicians, without verifying the work *in fact* performed;

- Whether ITG has a policy or practice of pressuring Technicians to work off-the-clock, and underreport their hours;

- Whether ITG has a policy or practice of failing to comply with California meal and rest break laws;

- Whether ITG has a policy or practice of refusing to reimburse necessarily incurred expenses; and

- Whether ITG fails to issue accurate, itemized wage statements by failing to: (1) distinguish between productive and non-productive hours; (2) include any information

---

[68] Taylor Dep. at 61:8-17; Rivera Dep. at 33:18-20.

concerning completed piece rates or the value at which they were compensated; and (3) identify what regular hourly rate, and what overtime rate, applies to a given week.

Because it is plain that this class wide proceeding can "generate common answers apt to drive the resolution of the litigation[,]" *Dukes,* 564 U.S. 338, 350, Plaintiff easily satisfies the limited burden to demonstrate commonality pursuant to Rule 23(a)(2).

### 3.  Plaintiff's Claims Are Typical of the Class.

Fed. R. Civ. P. 23(a)(3) requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." A named plaintiff's claim is typical under Rule 23(a)(3) if it " 'arise[s] from the same event, practice or course of conduct that gives rise to the claims of the absent class members' " and is " 'based on the same legal or remedial theory.' " *In re Dynamic Random Access Memory (DRAM) Antitrust Litig*., No. M 02-1486 PJH, 2006 WL 1530166, at *4 (N.D. Cal. June 5, 2006) (alteration in original) (citation omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

Here, the claims of Plaintiff and each Class member arise from the same practices and the same course of events. Namely, all claims arise from ITG's employment practices applicable to Plaintiff and the Technicians alike. Plaintiff and each Technician have the same claims based on the same conduct, namely ITG's: (1) failing to pay proper minimum wage, overtime wages, and completed piece rates; (2) failing to provide a reasonable opportunity to take meal and rest periods, and failing to properly compensate Class members when such meal and rest periods were not taken; (3) failing to reimburse necessarily-incurred business expenses; and (4) failing to issue accurate, itemized wage statements.

The claims of Plaintiff and Class members are typical because they arise from the same event, practice, and course of conduct, and are based on the same legal theories. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *4; *Hanlon*, 150 F.3d at 1020. Accordingly, Plaintiff satisfy the "permissive" typicality standard under Rule 23(a)(3).

### 4. Plaintiff and His Counsel Will Adequately Represent the Class.

Fed. R. Civ. P 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." This requires a plaintiff to demonstrate that "(1) neither they nor their counsel have any conflicts of interest with other class members, and (2) they and their counsel will prosecute the action vigorously on behalf of the class." *Mullins v. Premier Nutrition Corp.,* No. 13-cv-01271-RS, 2016 U.S. Dist. LEXIS 51140, at *12 (N.D. Cal. Apr. 15, 2016). Courts have also "interpreted this test to encompass a number of factors, including the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Ries v. Ariz. Bevs. USA LLC,* 287 F.R.D. 523, 540 (N.D. Cal. 2012). The adequacy of representation requirement is satisfied here.

There are no conflicts of interest or antagonism between Plaintiff and his counsel and the Class.[69] Plaintiff and the absent Class members have a shared interest in recovering the money to which they are entitled under California wage and hour laws. To represent him and the Class, Plaintiff retained counsel highly experienced in employment class action litigation.[70] Plaintiff and his counsel have prosecuted, and will continue to prosecute, this action vigorously on behalf of the Class.[71] Accordingly, the adequacy of representation requirement is satisfied.

### C. The Requirements of Rule 23(b) – that Common Questions Predominate and that a Class Action is Superior – Are Satisfied.

Plaintiff seeks certification of the Class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) encompasses "those cases in which a class action

---

[69] Any concerns regarding the existence of an arbitration agreement for some class members can be addressed at the January 23, 2020 hearing on ITG's Motion to Compel Arbitration. If the Court denies ITG's motion, the Class will remain undisturbed as the arbitration agreements will be found invalid. On the other hand, if the Court is inclined to grant ITG's motion, the affected Technicians who are deemed to have signed a valid and binding arbitration agreement will not be included in the certified Class.

[70] *See generally,* Declaration of Carolyn H. Cottrell; Declaration of Sarah R. Schalman-Bergen.

[71] *See supra,* n. 70.

would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Wahl v. Am. Sec. Ins. Co.*, No. C 08-00555 RS, 2010 U.S. Dist. LEXIS 54637, at *25 (N.D. Cal. May 10, 2010) (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment). "At this stage, plaintiffs need only show that there are bona fide questions capable of class-wide resolution." *Clemens v. Hair Club for Men, LLC*, No. C 15-01431 WHA, 2016 U.S. Dist. LEXIS 50573, at *8 (N.D. Cal. Apr. 14, 2016) (Alsup, J.) (citing *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015)).

### 1. Common Questions of Law and Fact Predominate Over Individual Issues for All California Claims.

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *In re Lenovo Adware Litig.*, No. 15-md-02624-RMW, 2016 WL 6277245, at *17 (N.D. Cal. Oct. 27, 2016). This "inquiry involves weighing and evaluating the common and individual issues in the case." *Brown v. The Hain Celestial Grp., Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *15 (N.D. Cal. Nov. 18, 2014). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1045 (2016).

"When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *In re Cathode Ray Tube (CRT) Antitrust Litig., 308 F.R.D. 606, 620 (N.D. Cal. 2015)* (quoting *Hanlon*, 150 F.3d at 1022). This analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir. 2013) (citations and internal quotation marks omitted).

Importantly, predominance does not require "that each element of [a plaintiff's] claim is

susceptible to class wide proof." *Amgen,* 568 U.S. at 469 (citation and internal brackets and quotation marks omitted). Courts have "held that common questions predominated even though certain class members' circumstances varied and some of the defendant's practices would have to be proven by anecdotal testimony." *Delagarza v. Tesoro Refining & Mktg. Co.*, No. C--09--5803 EMC, 2011 WL 4017967, at *12 (N.D. Cal. Sept. 8, 2011) (Chen, J.) (citation omitted). In the wage and hour context, evidence of "centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg.),* 571 F.3d 953, 958-59 (9th Cir. 2009).

Common questions of law and fact predominate over individual issues in this case. As discussed in detail in the following sections, common issues predominate as to Plaintiff's claims for: (a) minimum wage and overtime, (b) meal and rest breaks, (b) expense reimbursement, and (d) wage statement claims.

### a) Common Issues Predominate Plaintiff's Minimum Wage and Overtime Claims.

Determining whether ITG properly compensated Technicians for minimum wage and overtime for all hours worked, can be done in one fell swoop for all Technicians using common evidence of ITG's policies. "Hours worked" is defined in subdivision 2(K) of the wage order as "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs., tit. 8, § 11040, subd. (2)(K). In California, employees must be compensated for *each* hour worked. *Armenta v. Osmose, Inc.,* 135 Cal. App. 4th 314, 323 (2005).

Plaintiff contends that Technicians are not compensated for each hour worked because they were not compensated for time spent driving to and from work on behalf of ITG. *See supra,* Section II.C, n. 30. This claim is premised on a common theory of liability and on common evidence. Time driving is considered hours worked in California when the employer exerts sufficient control over the employees during their drive time to render the employees' driving time compensable. *Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1061-62 (9th Cir. 2010). In *Rutti*, the Ninth Circuit found the

driving time of Lojack installers and repairers compensable under California law because Lojack prohibited the plaintiffs from stopping for personal errands, taking passengers on the vehicles, taking any detours from Lojack's designated route, or using their cell phones except to answer calls from Lojack. *Id.*

ITG exerts even more control over Technicians through its driving policy than Lojack did in *Rutti*. Like in *Rutti*, ITG policy prohibits Technicians from stopping for personal errands, taking passengers in their vehicles, or using their cell phones while driving. *See supra*, Section II.C, n. 32, 33. In addition, ITG's "Drive Cam," and "Cell Control" monitor Technicians while they are driving. *See supra*, Section II.C, n. 34. The GPS and Drive Cam tracks speeding, and excessive changes in G-force, while the Cell Control blocks all incoming calls, messages, and app usage. *See supra*, Section II.C., n. 34, 35. Technicians can be, and are, disciplined for violations of ITG's driving policies regardless of when they occur. *See supra*, Section II.C., n. 36. Whether ITG exerts sufficient control over Technicians while driving such that drive time constitutes "hours worked" is a common question for all Technicians and one that can be answered by common evidence. This question predominates over any individual issues, such as the amount of time driving, or the rate of pay. Once this issue is resolved for the class, then liability and damages can be quickly and easily determined based on Defendants' records.[72]

In addition to the drive time, common evidence concerning ITG's policies and practices relating to overtime compensation present additional common issues and questions that predominate. First, ITG's common policy of pressuring Technicians to underreport total hours worked will be used to establish ITG's overtime and minimum wage liability on a class wide basis. ITG prohibited Technicians from clocking in before 7:00 a.m., and required them to clock out immediately upon completion of their last job.  *See supra*, Section II.C., n. 38. This was the case despite Technicians often beginning work before 7:00 a.m., and continuing to work after their last

---

[72] ITG maintains multiple types of records that could assist in determining the length of the drive time at issue. ITG utilizes a GPS tracking system that tracks the movement of the truck at all times. In addition, ITG tracks the location of the assignments for each Technician. It would not be difficult to calculate the time it would take a Technician to travel directly home (or to the warehouse) from their last assignment. *See supra*, n. 27.

job of the day. *See supra*, Section II.A, n. 7, 8. As a result of this policy Technicians report that they did not document time spent working before 7:00 a.m. or work done after their last job of the day. *See supra*, Section II.C., n. 40. In addition, Technicians testify that they were told by their supervisors that they should not list all work time in order to bolster their "production." *See supra*, Section II.C, n. 41. This unreported work time results from ITG's common policies and practices applicable to all Technicians.

Second, Plaintiff also contends that Technicians' overtime rate was not properly calculated because of ITG's common practice of improperly deleting completed piece rates in order to be consistent with their customer's database. *See supra*, Section II.B.2., n. 27. By doing so, ITG fails to pay overtime in accordance with Technician's "regular rate" of pay. To calculate the regular rate of pay to be used in the overtime calculation for a pieceworker, the employer must add together the "total earnings for the week." 2002 Division of Labor Standards Enforcement Policies and Interpretations Manual § 49.2.1.2; *see also* 29 C.F.R. Section 778.111 ("total earnings for the workweek from piece rates and all other sources.") That value is then divided by the number of hours worked in the week in order to yield the "regular rate" for the week. *Id*. By deleting completed piece rates and otherwise manipulating the piece rates to match customer demands, ITG fails to account for all earnings for the workweek and thus shorts Technicians in calculating their regular and overtime rates of pay. Whether ITG's approach complies with California law is a common question that predominates.

Lastly, ITG's policy of averaging productive and non-productive time results in a undercalculation of the proper overtime rate for all Technicians. During the time that ITG used it initial payment scheme, ITG improperly averaged productive and non-productive time to determine the applicable hourly rate. *See supra,* Section II.B.1, n. 16. By averaging, ITG failed to properly and separately pay Technicians for nonproductive time as required under California law. *See Cardenas v. McLane FoodServices, Inc.*, 796 F.Supp.2d 1246, 1252 (C.D.Cal. 2011) ("[A] piece-rate formula that does not compensate directly for all time worked does not comply with California Labor Codes, even if, averaged out, it would pay at least minimum wage for all hours worked."). When

that time is properly accounted for, the Technicians' regular rate used to calculate the overtime rate will go up, which will cause the overtime rate to similarly go up.

All this common evidence will be used to show minimum wage violations for ITG's failure to compensate Technicians for all time worked. Where Technicians worked at least 8 hours a day or forty hours a week, this common evidence of uncompensated time will not only show a minimum wage violation, but will also establish that Technicians were compensated at less than one and one-half times the regular rate of pay for these overtime hours. These common issues are the predominate issues that will allow Plaintiff's minimum wage and overtime claims to be resolved on a class wide basis.

**b) Common Issues Predominate over Plaintiff's Meal and Rest Break Claims**

To comply with California's meal and rest break rules, "an employer must relieve the employee of all duty for the designated period[.]" *Brinker Restaurant Corp v. Superior Court,* 273 Cal. 4th 1004, 1034 (2012); *see also Augustus v. ABM Security Services, Inc.,* 2 Cal. 5th 257, 265 (2016) ("employers' responsibilities are the same for meal and rest periods—an inference that also reflects the protective purpose of both."). To comply with these rules, "[e]mployers must afford employees uninterrupted half-hour periods in which they are relieved of any duty or employer control and are free to come and go as they please." *Brinker,* 273 Cal. 4th at 1037. "The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." *Id.* at 1040. Plaintiff's meal and rest break claims are predominated by five common issues: (1) over scheduling, (2) non-compliant meal and rest break policies, (3) meal and rest break policies that place the burden on Technicians to comply with the law, (4) failure to pay premium pay for missed meal and rest breaks, and (5) averaging of productive and non-productive time to determine the rate at which rest breaks are compensated.

First, as this Court recognized in *Richardson v. Interstate Hotels & Resorts, Inc.,* whether or not the practical effect of an employer's policies and procedures which placed an unreasonable workload on employees pressured them to skip rest breaks, and whether or not the employer knew

as much, are questions common to the proposed class. No. C 16-06772 WHA, 2018 U.S. Dist. LEXIS 40377, at *8 (N.D. Cal. Mar. 12, 2018) (Alsup, J.). This is because "an employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks." *Id.* at 1040 (citing, *Cicairos v. Summit Logistics, Inc.*, 133 Cal.App.4th 949, 962–963 (2005)); *Jaimez v. DAIOHS USA, Inc.,* 181 Cal.App.4th 1286, 1304–1305 (2010) (proof of common scheduling policy that made taking breaks extremely difficult would show violation).[73] "The wage orders and governing statute do not countenance an employer's exerting coercion against the taking of, creating incentives to forgo, or otherwise encouraging the skipping of legally protected breaks." *Brinker,* 273 Cal. 4th at 1040.

Here, Plaintiff can and will demonstrate that ITG has a uniform policy of pressuring Technicians to skip their meal and rest breaks. This showing will be made with overwhelmingly common evidence. The declarations of ten Class Members,[74] explain that ITG packs Technicians' schedules with more work than can be performed, which does not permit the taking of meal and rest breaks. *See supra*, Section II.A, n. 9-14. Technicians are generally assigned at least six jobs per day, which typically take between one and four hours to complete, and up to an entire day. *See supra*, Section II.A, n. 10-12. Regardless, ITG expects and typically schedules 2 hours to complete each job. *See id*. Oftentimes, ITG schedules more than one job during a two-hour period, forcing Technicians to run behind schedule. *See supra*, Section II.A, n. 10. Once a Technician completes one job, they drive to their next job and are required to make it there within the scheduled two-hour period. *See supra*, Section II.A, n. 14. These trips can take up to an hour depending on traffic. *See supra*, Section II.A, n. 13. Whether this schedule, established by ITG, leaves any time for Technicians to take a compliant meal or rest break is a common question that

---

[73] The Court in *Jaimez v. DAIOHS USA, Inc.,* explained that "for purposes of the class certification motion, the predominant common factual issue is whether RSR's missed meal breaks because First Choice's policy and practice of designating delivery schedules and routes precluded RSR's from timely completing their routes and taking the legally required rest breaks". *Id*.

[74] This number represents a significant amount – approximately 10% – of the putative Class, particularly considering the Court's order that ITG produce a sample of twelve California Technicians' pay and job code records. Lim Decl., ¶ 27. *See also Dukes,* 564 U.S. at 358 (2011)(citing *Teamsters v. United States,* 431 U.S. 324 (1977) as example of case in which affidavits from 12.5% of employees was sufficient to establish company-wide discriminatory practice).

1  predominates Plaintiff's meal and rest break claims. *Richardson*, 2018 U.S. Dist. LEXIS 40377,

2  at \*8.

3        Second, in addition to pressuring Technicians to skip their meal and rest breaks, ITG's

4  common policies were facially non-compliant with California's meal and rest period obligations.

5  Up until late 2018, ITG's meal and rest break policy was that Technicians "*[a]ll employees are*

6  *required to take an unpaid, 30-minute lunch break during their normal business day.*" *See supra*,

7  Section II.A, n. 47, 48. This policy does not conform with California law in that it does not require

8  the meal period to start before the end of the fifth hour of work, it requires manager approval to take

9  the meal period, and it does not provide for a second meal period for employees working 10 hours

10  or more hours. *See id*; *see also*, *Brinker*, 273 Cal. 4th at 1037. Notably, this policy also does not

11  require that the meal period be uninterrupted, that Technicians are relieved of any duty or employer

12  control, or that Technicians are free to come and go as they please. *See supra*, Section II.A, n. 47,

13  48. The policy is also silent as to what to do when a meal or rest period was missed. *See supra*,

14  Section II.A, n. 47, 48, 50, 51. Class members confirm the lack of a compliant policy indicating

15  that, when Technicians actually took a meal break, they were required to be available by cell phone

16  to respond to any work calls. *See supra*, Section II.D, n. 47; *see also*, *Augustus*, 2 Cal. 5th at 269

17  (explaining that one cannot square the practice of compelling employees to remain at the ready,

18  tethered by time and policy to particular locations or commulmunications devices, with the

19  requirement to relieve employees of all work duties and employer control).

20        ITG also violated California law on a classwide basis by not providing a second meal period

21  when a Technician worked over ten hours in a day. *See supra*, Section II.D, n. 48. As a matter of

22  uniform policy and practice, it is undisputed that at least until October 2018, ITG had no policy to

23  provide a second meal break to Technicians working more than ten hours. *See supra*, Section II.A,

24  n. 48, 49. This policy and practice was common to all Technicians in California and predominates

25  any individualized inquiry.

26        Third, in late 2018 ITG issued a "Meal Periods and Start/End Time Memo," in which it

27  indicated that meal periods were to be taken before the end of the fifth hour of work and that

28  Technicians were entitled to a second meal period before the end of the 10th hour of work. *See*

*supra*, Section II.D, n. 54. These changes brought ITG's policies more in line with California law, however, the updated policy remains non-compliant. The updated policy still mandates that "Employees are responsible for scheduling their own meal periods in consultation with their supervisor…" *See Supra* Section II.D, n.53-55. By passing the responsibility for making breaks available to the Technicians – regardless of the workload assigned – Technicians are never "relieved of all duty and free to go as they please." *Brinker,* 273 Cal. 4th at 1037. In other words, ITG does not have a policy to permit Technicians "a reasonable opportunity to take an uninterrupted" meal or rest break and are "impeded" from doing so. *Id.*

Fourth, Plaintiff has also shown with common evidence that despite not providing meal periods to Technicians, prior to early 2019, ITG did not pay premium pay for missed or noncompliant meal breaks or rest periods in California. *See supra*, Section II.D, n. 52. This unlawful practice was applicable to all of ITG's California employees and establishes yet another common issue that predominates. *See Saechao v. Landry's Inc.*, No. C 15-00815 WHA, 2016 U.S. Dist. LEXIS 33409, *17 (N.D. Cal. Mar. 15, 2016) (Alsup, J.) (finding plaintiff's argument that defendant's practice of placing the burden on employees to affirmatively take rest breaks or inform their employer that a rest break could not be taken "is a legal question plainly capable of class-wide resolution").

Finally, ITG's pre-2019 policy and practice of averaging compensation for productive and non-productive time, results in an under-calculation of the proper rate to be paid for rest periods. Employees compensated on a piece-rate system must be compensated for "rest and recovery periods" at the greater of: (i) "An average hourly rate determined by dividing the total compensation for the workweek, exclusive of compensation for rest and recovery periods and any premium compensation for overtime, by the total hours worked during the workweek, exclusive of rest and recovery periods," and (ii) "The applicable minimum wage." Lab. Code § 226.2(a)(3). ITG failed to comply with this provision of the Labor Code.

ITG did not separately compensate Technicians for their rest and recovery periods at the appropriate hourly rate. *See generally supra,* Section II.B.1. ITG's piece-rate calculation created an hourly rate applicable to all hours worked (including the rest and recovery periods), but that

1   calculation was not in compliance with the requirement of Section 226.2(a)(3).[75] Namely, in

2   calculating the average hourly rate ITG's formula used the total compensation for the work week

3   that was not exclusive of compensation for rest and recovery periods, similarly, the total hours

4   worked during the workweek was not exclusive of rest and recovery periods.  *See generally supra*,

5   Section II.B.1.

6           Whether ITG's meal period policies, or lack thereof, were legally compliant is a common

7   issue for all class members, and one that can be determined by a review of the policies themselves.

8   This issue predominates over any individualized issues because once this determination is made the

9   only remaining issue is determining the amount of damages. These common issues demonstrate that

10  Plaintiff's meal and rest break claims can be tried on a class wide theory of liability. *See*

11  *Richardson*, 2018 U.S. Dist. LEXIS 40377, at *8; *Jaimez,* 181 Cal.App.4th at 1304–1305.

12  Individual issues do not predominate Plaintiff's meal and rest break claims. The Ninth Circuit

13  explained in *Abdullah v. U.S. Security Assoc., Inc.* that "it would not be difficult to determine [the

14  employer's] liability to individual plaintiffs" because "[d]efendant's records of each employee's

15  clock-in and clock-out times, how much he was paid, and whether he was staffed at a single guard

16  post[] can be used to extrapolate whether his meal break was on- or off-duty." *Abdullah v. U.S.*

17  *Security Assoc., Inc.*, 731 F.3d 952, 966-67 (9th Cir. 2013) (affirming class certification). The same

18  is true here. Whether Technicians were provided a compliant meal period can be extrapolated from

19  Defendants' own data regarding clock-in and clock-out times, how much Technicians were paid,

20  and where Technicians were at the time of the purported meal period.

21          **c)   Common Issues Predominate over Plaintiff's Expense Claims.**

22          California Labor Code Section 2802 requires an employer to "indemnify his or her

23

24  [75] The question of how Technicians are compensated – whether piece rate or by the hour – is a
    common question that predominates Plaintiff's claims. The DLSE defines piece work as "[w]ork
25  paid for according to the number of units turned out." 2002 Division of Labor Standards
    Enforcement Policies and Interpretations Manual § 2.5.1. The Manual specifically identifies as an
26  example of a piece-rate plan: "Technicians paid by the number of telephones installed." *Id*. at §
    2.5.2. Further, it provides that a piece-rate plan may be in addition to an hourly rate or a salary rate
27  of pay. *Id*. at § 2.5.5.1. Common evidence –  ITG's written compensation plan and its 30(b)(6)
    deponents – confirm that ITG's compensation plan for Technicians is a piece-rate plan. *See supra*,
28  Section II.B.1. Technicians receive points for each installation they complete and then are
    compensated based on the value of those points in addition to a base hourly rate. *See id*.

employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer." Because "putative class members were engaged in a common type of job and performed common tasks … an expense which is 'necessary' for a class member to do his job would also be "necessary" for any other class member." *Dilts v. Penske Logistics, LLC,* 267 F.R.D. 625, 639-40 (S.D. Cal. 2010); *Swamy v. Title Source, Inc.*, 2018 U.S. Dist. LEXIS 57048, at *6.

Here, common evidence shows that it is ITG's policy and practice not to reimburse Class members for necessary tools and equipment, including cellular phones and monthly cellular charges, wireless drill, drill bits, boots and pants. *See supra*, Section II.E, n. 56, 57. In addition, ITG deducted from Technician's wages for damages to customers' homes, lost equipment, and auto repairs. *See id*. This common practice predominates over Plaintiff's expense reimbursement claims.

### d)  Common Issues Predominate over Plaintiff's Independent Wage Statement Claims.

Section 226, subdivision (a) sets forth nine itemized requirements for a wage statement. Of these requirements, those relevant to this case include: (1) gross wages earned, (2) total hours worked, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, and (4) all applicable hourly rates in effect during the pay period. *See id.*

Plaintiff will show with common evidence that ITG violates Section 226 with respect to every Technician, for every pay period. As a matter of policy and practice, ITG does not include the number of piece-rate units earned and their corresponding rate on Technicians wage statements. *See supra*, Section II.F, n. 63. This common evidence will show that ITG violated Section 226 with respect to the entire Class in a single stroke.

ITG's failure to properly compensate Technicians for meal and rest periods, for commute time, and for all hours worked results in derivative wage statement violations. To the extent those claims are subject to common proof as outlined above, they are common evidence of ITG's wage statement violations.

### 2.  A Class Action is Superior Method to Adjudicate this Controversy.

Rule 23(b)(3) also requires that class resolution be "superior to other available methods for fairly and efficiently adjudicating the controversy." The relevant factors to guide this determination

include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. Rule 23(b)(3)(A)-(D). All these factors weigh in favor of superiority here.

Plaintiff is aware of no other pending California cases related to the issues in this action. The fact that approximately 23[76] California Technicians have already opted into this case confirms that Class members do not wish to individually control the prosecution of their claims. Concentrating the litigation of these claims in this forum is desirable. Further, because of the modest damages in this case, Class members are unlikely to pursue individual claims. As Judge Posner has observed, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Opperman v. Path, Inc*., No. 13-cv-00453-JST, 2016 U.S. Dist. LEXIS 92403 (N.D. Cal. July 15, 2016), at *56 (quoting *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (original emphasis)). Indeed, "[c]ases, such as this, where litigation costs dwarf potential recovery are paradigmatic examples of those well-suited for class wide prosecution." *Mullins*, 2016 U.S. Dist. LEXIS 51140, at *25 "Individual suits for small recovery amounts would overwhelm the courts and prove uneconomic for potential litigants." Id. at *25-26. Finally, for reasons detailed in the predominance section, this class action will not present any manageability concerns. Thus, a class action is clearly superior to the alternatives.

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court certify the California Class pursuant to Fed. R. Civ. P. 23(b)(3).

Date: December 19, 2019                                    Respectfully submitted,

*/s/ Ori Edelstein*
Ori Edelstein
SCHNEIDER WALLACE
COTTRELL KONECKY LLP

---

[76] *See* Lim Decl. ¶ 28.