EXHIBIT X

Carolyn Hunt Cottrell (SBN 166977)
Ori Edelstein (SBN 268145)
Michelle S. Lim (SBN 315691)
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
ccottrell@schneiderwallace.com
oedelstein@schneiderwallace.com
mlim@schneiderwallace.com

Sarah R. Schalman-Bergen (*pro hac vice*)
Krysten Connon (*pro hac vice*)
BERGER & MONTAGUE, P.C.
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone:  (215) 875-3000
Facsimile: (215) 875-4604
Sschalman-bergen@bm.net
KConnon@bm.net

Attorneys for Plaintiff, the Collective, and putative Class, and Aggrieved Employees on behalf of the State of California

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL MONPLAISIR, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>INTEGRATED TECH GROUP, LLC and ITG COMMUNICATIONS LLC,<br><br>Defendants. | Case No.: 3:19-cv-01484-WHA<br><br>**DECLARATION OF JOHN CASON**<br><br>Judge: Hon. William Alsup<br><br>Complaint Filed: March 21, 2019<br>Trial Date: October 19, 2020 |

# DECLARATION OF JOHN CASON

I, John Cason, have personal knowledge of the facts stated in this declaration and would testify to those facts if called upon to do so.

1. I am an adult resident of San Francisco, California.

2. I worked as a Technician for Integrated Tech Group, LLC and ITG Communications LLC (collectively "Defendants" or "ITG") in California, Texas, and Florida.

3. I worked as a Technician in the San Bruno and San Francisco Bay Area in California from approximately March 2018 to November 2018 and from approximately February 2019 until April 2019.

4. During this entire time, ITG classified me as a non-exempt employee.

5. During my time working for ITG, I performed various services, all related to the installation and repair of cable services for ITG's client(s). The services included, installing cable, Internet, and telephone; troubleshooting; running new telephone lines; running coax cables for new outlets; installing ground cable; educating customers on equipment; providing customer service; and replacing and installing drops.

## EXPERIENCE WORKING AT ITG AS A FIELD TECHNICIAN IN CALIFORNIA

## TYPICAL WORKDAY

6. Each morning, I was notified of my jobs for the day through "Tech 360," which is an application that Comcast Corporation and ITG used for managing jobs. I logged onto Tech 360 on my phone in order to check my first job assignments and determine what tools and equipment I would need. Throughout my employment at ITG, I used my personal cellphone to log onto Tech 360. If I did not log in by 7:00 a.m., my supervisors, Carmen D'Augstine, would call me on my personal cellphone to instruct me to log in.

7. After I logged onto Tech 360, I would determine whether I had enough equipment and perform a safety check on the company truck provided by ITG, which I would then drive either to the warehouse, or directly to my first job. Throughout my time working as a Technician for ITG in California, I generally went to my first job. I did not clock in until I arrived at my first job in the morning.

8. My supervisors also required that I attend mandatory weekly team meetings to discuss installations and ways to increase productivity. These meetings were typically between fifteen (15) and twenty (20) minutes. I was generally not clocked in during these meetings.

9. Approximately once a month, I was also required to report to the warehouse so that ITG could perform an inventory of the equipment in my vehicle and so I could obtain additional equipment, such as modems, cable boxes, remotes, cable cords, coax cables, telephone line cubes, electrical tap, stickers, signs, nails, silicone, Ethernet cable, amplifiers, tie wrap, ground wire, DVR boxes, grounders (for aerial drops), splitters, fittings, plastic moldings and wood putty from ITG. This took several hours and I do not believe I was compensated for this time.

10. I used ITG's application, Fuse, on my personal cellphone to clock-in and out. Fuse, however, would not allow me to clock in before 7:00 a.m., even though I started before 7:00 a.m. each day. My supervisors instructed me to alter my time, and they would change my timecards themselves.

11. Typically, I was assigned between five (5) and six (6) jobs per day. ITG limited the allotment of time for each job to a two (2) hour time frame regardless of the scope of work to be performed. Individual jobs varied in length, up to an entire day to complete.

12. There were some days I was assigned my full workload, yet twice per week of more, ITG also instructed me to help out other Technicians. I do not believe that ITG counted jobs originally

DocuSign Envelope ID: 39DE37A3-9924-4531-96E2-2CA704E74C32

assigned to other Technicians toward my jobs assigned and completed per day. Therefore, in addition to the jobs assigned to me by ITG, my total jobs for the day would increase.

13. During the course of the day, job assignments were often removed. Throughout my employment there were many times I would click on an assigned job, accept the job, enter the job location in the GPS, and drive to the customer's home. When I arrived at the job and parked the truck outside the customer's home, I would then log into Tech 360 to indicate I was on the job, but the job assignment would be removed. I called my supervisors to complain; however, the job rarely came back. Regardless of which supervisor I complained to, I would have to wait for the job to come back. I typically waited an extra thirty (30) minutes to one (1) hour for the job to come back, but it rarely did.

14. Similarly, if I had not yet signed into Tech 360 to enter that I completed a job, such jobs were taken away from me when I was in the middle of the job or had completed the job

15. After I completed a job, I would drive to the next job. The drive time between jobs in California often took upwards of thirty (30) minutes.

16. I was repeatedly told by my supervisors to minimize my recorded hours because this would show higher production.

17. My day usually ended after my last job between 5:00 p.m. and 6:45 p.m., at which point I would clock-out for the day. Sometimes I would receive another job assignment at the end of my workday, even at 7:00 p.m. After I completed the last job of the day that ITG assigned to me, I would drive the car provided by ITG to the hotel. This drive usually took upwards of thirty (30) minutes, up to two (2) hours, depending on traffic.

18. I believe my supervisors would frequently make changes to my time sheets on my behalf. My supervisors would change the time sheets for me to alter the true hours I worked and the codes that corresponded to the jobs that I completed.

19. In total, I would work typically six (6) days per week, on average between eleven (11) and twelve (12) hours per day, and between sixty-six (66) and seventy-two (72) hours per week.

### MEAL BREAKS

20. As a Technician, I was not able to take a full 30-minute meal period during the first five (5) hours of being on duty. Although I "clocked out" for lunch, it is nearly impossible to take an uninterrupted meal period at the time that I clocked out because of the demanding schedule. The number of jobs assigned in a given day and the amount of time jobs typically took to complete made it difficult to take an interrupted meal break.

21. Any time I took to eat would typically take place while I was driving from one job to another, and even then, I was required to have my cellular telephone on me at all times and be available to respond to any work calls.

22. It was nearly impossible to take an uninterrupted meal break.

23. Even though my shifts exceeded ten (10) hours, ITG regularly did not provide me with second meal periods either.

### REST BREAKS

24. As a Technician, I generally was not provided with full 10-minute rest period for every four (4) hours worked during which I was relieved of all duties. My supervisors instructed me to continue working until each job was finished. Once I would finish one job, I was instructed to move on to the next job. I was not allowed rest breaks. This was true throughout my time working in California for ITG.

25. I was considered "on duty" and, although I worked through my rest breaks, I was not compensated the one hour of premium pay for each workday that the rest periods were not permitted.

### BUSINESS EXPENSES

26. In order to do my job, I had to purchase tools and equipment, such as a cellular phone, a drill, drill bits, boots, and pants. I was never reimbursed for these expenses.

27. ITG provided fuel cards, but there were restrictions on the amount of fuel I could purchase and restrictions of where I could purchase the fuel. I had to make sure to fill up the truck with fuel by 9:00 a.m. or else I was responsible for the cost of fuel. Because of my packed schedule, I often was unable to fuel my truck before 9:00 a.m., and I ended up paying for approximately $50 worth of fuel every week myself. I was rarely reimbursed.

28. I believe that ITG made other deductions from my pay. For example, if a customer called back with a service issue, or to complaint that something was not working properly, I believe that replacement parts were deducted. I was charged for equipment I never lost, and damage to a customer's home that never occurred. I was not able to see any detailed deductions on the Fuse application.

## COMPENSATION

29. While working for ITG, I entered codes and hours for the various job tasks I performed, and each of those codes corresponded to a specific dollar amount. My wage statements did not show this information and instead said that I was paid on an hourly basis. ITG told me that the codes that I entered into the system were related to my pay.

30. ITG would regularly delete codes for tasks I had completed or change the codes to a lower paying code. My supervisors would instruct me not to enter certain codes for work that I had completed. My supervisors also instructed me not to enter any codes when assisting other Technicians with jobs.

31. My finalized time entries were not accurate and showed a lower number of hours than I actually worked. My time entries either omitted or underreported the actual amount of time I spent working for ITG, including: performing safety and inventory checks on ITG's vehicle, attending

meetings, reconciling inventory, completing job assignments, taking meal breaks, performing all job codes, helping other Technicians with jobs, driving to and from the warehouse or the jobsites, and otherwise performing work for ITG after completing my last assigned jobs.

32. I do not believe that I received accurate wage statements. My pay stubs showed several regular and overtime rates, but it is unclear which rates applied to a given job, or to a given day's or week's work. My pay stubs did not include all the hours I worked, compensation for missed meal and rest periods, or all of my jobs or tasks I completed.

### EXPERIENCE AS A TRAVELING TECHNICIAN

33. ITG had me travel outside of my home region to work in California. I worked in California for twelve (12) months. I lived in a cramped hotel and apartment during those times when I worked for ITG as a Traveling Technician.

34. When I worked in the San Francisco Bay Area location, ITG only provided me with flights to and from the assigned worksite, a hotel room, a per diem as low as $25 dollars, and a gas card. The per diem amount was insufficient to cover all of my expenses. The gas card was also usually insufficient. Each week I spent up to approximately $50 out-of-pocket to cover the fuel expenses, and an additional $150 out-of-pocket to cover my per diem expenses.

35. I also stayed in a cramped hotel room and apartment with other Traveling Technicians and often was required to sleep on an air mattress on the floor.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and based upon my own personal knowledge.

Executed on this 19th day of December, 2019 in San Francisco, California.

*DocuSigned by:*
John Cason

DocuSign Envelope ID: 39DE37A3-9924-4531-96E2-2CA704E74C32