UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PAUL MONPLAISIR, et al.,

        Plaintiffs,

    v.

INTEGRATED TECH GROUP, LLC, et al.,

        Defendants.

No.  C 19-01484 WHA

**ORDER DENYING CLASS CERTIFICATION**

## INTRODUCTION

A prior order compelled most members of a nationwide FLSA collective to arbitrate their wage-and-hour claims.  Plaintiffs then sought to certify a class of California employees.  The arbitration order also binds putative class members, so the proposed class lacks numerosity.  Certification is **DENIED**.

## STATEMENT

Prior orders detail the facts here.  Briefly, plaintiffs, Paul Monplaisir, Jacky Charles, and Sterling Francois, and their fellow employees install cable and telecommunications equipment across the nation for defendants Integrated Tech Group, LLC and ITG Communications LLC.  The complaint alleges that defendants made employees work significant portions of their day off-the-clock, including trainings, pre-shift work, meal periods, driving time, and more.  Additionally, defendants allegedly pressured employees to alter or underreport time and systematically undercalculated their pay.  Plaintiffs sued in March 2019.  An August 6 order conditionally certified a nationwide FLSA collective (Dkt. No. 76) and around three hundred eighty employees joined by, or slightly after, the January 9, 2020, deadline (Dkt. No. 164).  A

1    March 2 order, however, compelled many of them to arbitrate their claims (Dkt. No. 167).

2    Undaunted, plaintiffs had moved to certify a class of California employees (Dkt. No. 128).

3        But a problem emerged.  Despite full briefing and a hearing, the putative class size

4    remained unknown because the parties' dueling motions targeted different groups.  Defendants

5    targeted the nationwide FLSA collective for arbitration.  Plaintiffs' class certification motion,

6    however, shifted to California employees, of unknown count, potentially sidestepping the

7    arbitration order.

8        Seeking clarification, a March 6 order held plaintiffs' motion in abeyance and directed

9    discovery to determine the putative California-class size, how many putative members had

10   been compelled to arbitrate, and how many remained free to proceed with the class (Dkt. No.

11   168).  Discovery, slowed by the initial COVID-19 shutdowns, appeared to reveal 238 putative

12   California class members, only 16 of which had not agreed to arbitrate (Dkt. No. 197).

13   Plaintiffs challenged the completeness of the proffered employee list and raised several

14   formation defects arising from the presence of blue-ink handwriting on many agreements

15   which appeared to post-date the largely black-ink terms and signatures.  A June 2 order

16   requested supplemental briefing (Dkt. No. 199) but cautioned that we would not revisit issues

17   that were raised *or that could have been raised* in opposition to defendants' motion to compel

18   arbitration.  When disputes of fact remained, a June 22 order requested further briefing (Dkt.

19   No. 205), and a July 20 order requested answers to specific questions via sworn declarations

20   (Dkt. No. 214).

21       Before the deadline for response, however, the parties informed us of a potential class

22   and collective settlement, brokered by wage-and-hour mediator Jeffrey A. Ross (not to be

23   confused with San Francisco Superior Court's Judge Jeffrey S. Ross).  Following extensions to

24   gather settlement-administrator bids, amidst the continued COVID-19 shutdowns, the parties

25   moved for preliminary approval of a settlement on behalf of the 384 member FLSA collective

26   and the 284 member putative California class.  A November 7 order, however, denied approval

27   as the proposal, detached from the merits, lined counsel's pockets and unfairly burdened a

28   subset of plaintiffs (Dkt. No. 236).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The parties' deferred supplemental declarations soon followed, but questions again

2 remained.  A December 15 order directed limited depositions and further briefing to clarify the

3 timing, origin, and purpose of the blue handwriting on the arbitration agreements and to better

4 develop the law on point (Dkt. No. 242).  The parties have now done so.  Nearly fifteen months

5 after plaintiffs moved to certify the California class, the time has come for decision.  Given the

6 full briefing on this and the motion to compel arbitration, a pre-COVID in-court hearing, and

7 more than enough supplemental briefing, certification turns on the single issue of numerosity

8 and may appropriately, and finally, be decided on the papers.

9                                        **ANALYSIS**

10    Numerosity, such that joinder of all putative members would be impractical, guards the

11 door to class certification.  Rule 23(a)(1); *Abdulla v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952,

12 956–57 (9th Cir. 2013).  No specific count warrants a class.  *Gen. Tel. Co. of the Northwest,*

13 *Inc. v. EEOC*, 446 U.S. 318, 330 (1980).  But Rule 23 doesn't set forth a pleading standard;

14 plaintiffs "must affirmatively" demonstrate "that the[y] are *in fact* sufficiently numerous."

15 *Comcast v. Behrend*, 569 U.S. 27, 33 (2013).  Thus, while most findings of fact are left for

16 trial, a trial court must make the requisite findings to support class certification.  *Cf. Berger v.*

17 *Home Depot*, 741 F.3d 1061, 1066 (9th Cir. 2014) (reviewing factual findings supporting

18 denial of class certification for clear error).

19    The proposed class fails for lack of numerosity.  The order compelling arbitration, as the

20 law of the case, binds putative class and collective members alike.  Our updated record

21 demonstrates nothing untoward about the blue marks on class members' arbitration

22 agreements.  And, plaintiffs have forfeited their present formation defenses to arbitration,

23 having been on notice of the relevant facts *before* moving for class certification.  The

24 remaining objections fail on the merits.  This whittles our putative class from 238 members to

25 sixteen, too few to proceed under Rule 23.

26    **1.    ORDER COMPELLING ARBITRATION APPLIES.**

27    The previous order compelling arbitration found defendants' form agreement, *to the*

28 *extent challenged*, not unconscionable and thus enforceable.  As the law of this case, these

3

1   standard agreements will be enforced against putative California-class members just as they

2   were against the nationwide collective.  *See Milgard Tempering, Inc. v. Selas Corp. of*

3   *America*, 902 F.2d 703, 715 (9th Cir. 1990).

4       **2.    THE MISCELLANEOUS MARKS ARE INNOCUOUS.**

5       The primary dispute concerns the origin of the miscellaneous blue marks on the

6   arbitration agreements.  Each agreement consists of five pages, four of terms and one of

7   signatures.  The first page includes blanks to fill in the employee's name and the location of the

8   arbitration.  Newer forms also include a blank for the date, but older forms employed

9   "[DATE]" to reference the date on which a new employee completed the entire new-hire

10  packet, which included the arbitration agreement.  Black ink appears to be the norm, so most

11  signatures on the agreements are in black ink.  But some are in blue.  In some cases, both

12  ITG's and the employee's signatures are in blue ink.  In others only one is.  Some agreements

13  include highlighting.  More include the employee's name in either blue or black ink in the top

14  right corner.  Most filled-in employee names are in black ink, but again, some are in blue.  And

15  many agreements with black signatures nevertheless have the arbitration location filled with

16  blue ink (Dkt. No. 172; Rivera Tr., Dkt. No. 248-2 at 71:21–72:5).

17      Plaintiffs alleged subterfuge, that defendants added the blue-in signatures and terms to

18  shore-up the deficient agreements in preparation for this litigation and their motion to compel.

19  The undersigned took this allegation seriously, ordering the several rounds of supplemental

20  discovery.  Careful review of our updated record, however, reveals no impropriety by

21  defendants.  To be sure, corporate counsel has work to do on defendants' procedures for

22  gathering employee assent to arbitrate — at deposition, defendants' human resources

23  supervisors openly *admitted* that the blue marks likely post-date the original signatures on the

24  forms.  But they offered consistent and innocent explanations.  Defendants' candor, the

25  obviousness of the suspect marks, and the reasonableness and consistency of the explanation

26  story assuage the initial concerns, as follows.

27      To start, defendants' director of human resources, Gissel Rivera, admitted that her

28  human-resources administrators added the large print, blue or black ink, names to the top right

United States District Court
Northern District of California

4

of most of the arbitration agreements to aid in alphabetizing the agreements in preparation for defendants' motion to compel arbitration here (Dkt. No. 241 at 6; Rivera Tr. at 64:24–65:15).

Our primary concern thus lies in the blue handwriting filling in terms and signatures of otherwise black-ink agreements. Human-resources supervisor Jessika Quesada described how defendants' human-resources administrators presented the arbitration agreements to new employees at orientation:

> [W]e present it to the new hire in a new hire packet. They're given their new hire packet upon arrival. We give them 30 to 40 minutes for them to review the entire new hire packet, fill everything out, then we usually come back to the training room, and we go over page by page the new hire packet. So we literally put on a projector, connect my laptop, show them a blank new hire packet just like you did earlier, go page by page explaining every single page of the new hire packet paragraph. Once we finish going over each page, they turn in their new hire packets, and one by one, I would review the entire new hire packet with the new hire standing in front of me. Anything that was missing information or that wasn't clear was — I would ask the new hire right there in front of me, "Hey, you missed an e-mail," or, example, "You missed a phone number." "Hey, on this page, you didn't put your initial," et cetera.

Ms. Quesada explained, however, that some forms came back incomplete. In those cases, a human-resources administrator might complete the form with the new hire.

> Once we finish [other orientation tasks], I then take all of those files back to my office, fill out, make sure that I sign everything I needed to sign, review the I-9 documents, scan the new hire packet, and submit it to corporate. So any arbitration agreement that is filled out was filled out in the presence of the employee. If something were to change, or if something needed to be filled out later, then one of two things would happen. We either go back to the class to give them the arbitration agreement or whatever file in the new hire packet is missing anything so they can fill it out, or if something was changing, we'd reissue a new agreement or a new policy or a new memo with whatever those changes are.

When pressed by opposing counsel, Ms. Quesada again acknowledged the possibility that forms might remain incomplete, but explained how that would have been handled:

> The expectation of the admins is that they were following the process that they were trained to do. If they did not have the employee in front of them and there's a blank line on the arbitration agreement, then it should have remained blank. We do not add terms to documents if the employee is not physically present or there to do it themselves.

\*        \*        \*

> Our general practice was to review as much as we could in the
> class with the employee there so that we wouldn't have to come
> back and interrupt the trainer in the middle of their training class,
> et cetera.  So, yes, we review everything as much as we could.
> That doesn't mean that we don't miss things.

(Quesada Tr., Dkt. No. 248-1, 54:18–58:22).

Ms. Rivera confirmed these ordinary procedures:

> So prior to having a new hire class, sometimes the [human
> resources] admins print the new hire packet first.  Sometimes it's a
> large class and they want to go through and make sure everything
> is printed ahead of that time.  When they do that, sometimes they
> will fill in the information that's required, for example, the
> location.  If not, then another way could be after the admin
> conducts orientation and they take the packets back out of the
> training room and into the admin office, and they're going through
> the document and they see that there's an area that's missing, then
> they can fill that in and re-present that arbitration agreement to the
> employee.

(Rivera Tr. at 59:8–20).  Like Ms. Quesada, Ms. Rivera acknowledged that, on occasion,

submitted new-hire arbitration agreements would be "missing some information," but

explained that:

> [I]f there is anything that's going to be added to the arbitration
> agreement, like an additional name or a location, it needs to be
> presented back to the employee in order for us to do that.  So we
> have to go back and find the employee or back to the orientation
> class to get that corrected.

(River Tr. at 16:10–17:20).  Based on her experience, Ms. Rivera rejected the notion that a

human-resources administrator would, contrary to her guidance, unilaterally add terms to an

arbitration agreement after the fact:

> It's certainly not the expectation that ITG would have or that ITG
> advised any admin.  And I think that's noticeable in the fact that
> we've submitted other arbitration agreements where the
> information has been missing.

Ms. Rivera also confirmed that she has never disciplined anyone for submitting an incomplete

arbitration agreement (Rivera Tr. 30:1–3, 50:4–8).

Put simply, defendants admit to adding most, if not all, of the questioned marks on the

arbitration agreements.  Defendants' human-resources administrators presented the arbitration

agreements to new employees as part of the new-hire packet and, though they would review the forms for completion, blanks would remain at times. In those cases, human resources would ask the employee to complete the agreement, complete the agreement with the employee present, or present a completed agreement for the new employee's approval. Each way, defendants sought each new employee's consent to the *complete* agreement. More important for our purposes, in no case did defendants unilaterally add terms to the agreements after the fact.

Plaintiffs offer little to refute this. To start, they do not contest Ms. Rivera and Ms. Quesada's innocuous explanations for the varying ink colors, that the human resources department simply used both blue and black pens (Dkt. No. 241 at 7–8, 14–15). Nor do plaintiffs point to any, and this order discerns no, testimony by either of plaintiff's witnesses, Clark Brown and Devaughn Cherrington, refuting defendants' assertion that completed agreements were presented to new employees for their approval (Dkt. Nos. 248-3, 248-4). Rather, plaintiffs focus on the admitted fact that defendants' fired one human-resources administrator, whose signature does appear on some of the arbitration agreements, for falsifying her timecard. But they do not develop this point into a credible charge that defendants falsified the arbitration agreements.

Plaintiffs next attempt to impeach Ms. Rivera with her earlier testimony that defendants used a single form of arbitration agreement throughout our relevant time period. But plaintiff points only to a minor change in the arbitration agreements, from denoting the effective date with "[DATE]" to the current blank space. This fails to convince. As Ms. Rivera clarified, aside from this minor update, the agreement, "word for word on every paragraph[,] is exactly the same as it's been since January 5, 2017" (Rivera Tr. at 72:2–5).

Last, plaintiffs make much of a discrepancy which actually appears to confirm the telling above. Defendants recently produced versions of the arbitration agreements for Mr. Brown and Mr. Cherrington, apparently different from those originally submitted last March (Dkt. No. 172-2 at 132, 221). Both Mr. Brown and Mr. Cherrington's "new" versions lack their name in large print in the top right corner, and Mr. Brown's "new" version lacks the blue-ink name and

arbitration location on page one, present in the original submission (Dkt. Nos. 248-8, -9).  But an email produced along with Mr. Cherrington's "new" version showed that defendants' local human-resources administrator initially submitted the incomplete agreement before the corporate human-resources office asked for it to be completed.  It appears the original, incomplete agreement, made its way to defendants' online database, from which it was recently gathered, whereas the completed version was only ever saved in Mr. Cherrington's personnel file in Florida.  In other words, defendants again admitted to the differences and later completion of forms, consistent with their explanations above that the forms would be completed with or by the employee (Rivera Tr. at 39:16–40:10; Quesada Tr. at 49:4–50:24).  Again, defendants' procedures leave much to be desired, but they evince no malfeasance.

### 3.    MOST FORMATION DEFENSES HAVE BEEN FORFEITED.

Even so, formation defects might linger in defendants' procedures for gaining employee assent to arbitrate.  But into such matters this order will not speculate.  For plaintiffs, we now confirm, forfeited such arguments long ago.  With the original motion to compel, plaintiffs might have taken discovery into defendants' procedures for gathering employee assent to arbitrate and raised any resulting formation defects, including lack of mutual assent, consideration, or other.  And, even after the original submission of arbitration agreements along with their motion to compel, defendants produced another batch of arbitration agreements on September 11, 2019.  The very *first* of these agreements, for employee Abdul-Hugg Abdullah, included the employee's name written in blue across the top right and the location for the arbitration in blue, despite his name and signature block in black.  The next, for employee Raul Vega, included his first name in black ink in the "Employee" fill-in-the-blank, but his last name in blue.  A few pages further, agreements for Gary Galves and Alexander Figueredo included highlighting (albeit black and white) on the first and last pages.  Indeed, this production included signed agreements for Clark Brown and Devaughn Cherrington, whose testimony regarding defendants' arbitration-agreement procedures plaintiffs now offer in support of their formation defenses, and Mr. Cherrington's name was not filled in on the first page of his agreement (Dkt. No. 252).

8

Plaintiffs, then, had nearly *five months* to take discovery into the origin, timing, and purpose of these blue marks, pursue related formation defenses in discovery, and seek supplemental briefing before our February 20 hearing on the motion to compel. They might still have raised the issue before the March 5 hearing on the instant class certification motion. And yet, plaintiffs waited to raise the blue-marks as an issue until the parties' May 26 joint statement regarding numerosity of the putative California class and until a June 18 supplemental brief to raise the issue of consideration (Dkt. No. 202 at 6). Additionally, though plaintiffs mentioned issues of assent in the May 26 statement, they failed to articulate such arguments until the June 18 supplemental brief (Dkt. Nos. 197 at 6–7; 202 at 5–6). The June 2 order already made clear that this order would not consider "issues that were raised, or could have been raised," in the original motion to compel or the motion for class certification. Having failed several times over to timely assert these formation defenses, and the undersigned now satisfied after several months of supplemental discovery that the blue ink reflects no impropriety, plaintiffs have forfeited such defenses. *See United States v. Jacobo Castille*, 496 F.3d 947, 952, fn. 1 (9th Cir. 2007) (en banc).

### 4. LAST REMAINING FORMATION DEFENSES FAIL.

Plaintiffs' last remaining challenge to the 222 signed arbitration agreements, the contention that one employee did not actually sign his agreement, does not square with the evidence. They argue that putative class-member Robinson Azema's "signature" on his arbitration form is just a zero with a strike through it, *i.e.*, not a signature but the "null sign" (Dkt. No. 172-2 at 53). In response, defendants submitted several other forms signed by Mr. Azema, each including a similar, broad circular mark ending in a more-or-less straight-line headed to the bottom-left (Dkt. No. 203-5). As far as an objective observer would discern, the mark — used in circumstances indicating assent and being reasonably consistent with his others — manifests Mr. Azema's assent. *See Palmquist v. Mercer*, 43 Cal. 2d 92, 98, 272 P.2d 26 (1954); *Serafin v. Balco Props. Ltd.*, 235 Cal. App. 4th 165, 173 (2015). Regardless, plaintiffs provide no testimony from Mr. Azema that his mark did not manifest his assent.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 5.    OBJECTION TO THE CLASS LIST FAILS.

Plaintiffs offer a single challenge to the completeness of defendants' 238-person class-member list, the testimony of one allegedly-missed California employee, Francisco Borges, who says he worked for ITG in Florida from April 2016 to July 2016 and in California from July 2016 to January 2017 (Dkt. Nos. 202-2; 207-2).  They cite, but do not actually submit, an earlier interrogatory response from defendants which allegedly included Mr. Borges as a California employee between July 2016 and May 2017 (Dkt. No. 207-1).

Defendants respond that Mr. Borges, whom they have documented as Francisco Borges Chirino, worked for them in Florida until his termination (without possibility of rehire) in June 2016 (Dkt. No. 206-4).  Ms. Rivera, the human resources director, says that defendants have no pay records for Mr. Borges Chirino after June 2016 — records that would exist if Mr. Borges Chirino had indeed continued working for defendants.  Ms. Rivera also says that if Mr. Borges Chirino had transferred to California, as he alleges, documents would reflect that transfer.  No such records exist.  In fact, the only transfer record for Mr. Borges Chirino reflects a move from Miami to Jacksonville, Florida (Dkt. No. 206-3, -4, -5).

The preponderance of the evidence herein presented leads to the conclusion that Mr. Borges Chirino did not work for defendants in California, much less during the relevant time period.  The objective records place him in Florida.  And, other objective records, which competent testimony establishes would exist to document Mr. Borges Chirino's allegations, do not appear.  True, defendants' old discovery response indicates Mr. Borges Chirino did work for ITG during the class period.  But, plaintiffs' interrogatory asked defendants to specify *nationwide* workers, *not* just California ones.  So, this evidence does not actually place Mr. Borges Chirino in the putative class.

Against the objective evidence, plaintiffs offer only Mr. Borges Chirino's bare statements that he worked in California.  The evidence not presented speaks the loudest.  Where in the spacious and heavily populated state of California did Mr. Borges Chirino work?  No one just magically appears in California for work and then magically returns to Florida in the evening.  Where in California did Mr. Borges Chirino live?  Simply, the bare assertions devoid of

supporting detail do not overcome the objective evidence that Mr. Borges Chirino did not work for ITG in California during the class period.  Plaintiffs' sole challenge to the class list fails.

### 6.   DEFENDANTS DID NOT WAIVE ARBITRATION.

Plaintiffs last contend that defendants waived arbitration by engaging in settlement discussions over the previous summer, but bear the burden to show that defendants knew of the right, acted inconsistent with it, and prejudiced plaintiffs.  *Richards v. Ernst & Young*, 744 F.3d 1072, 1074 (9th Cir. 2013).  True, defendants knew.  And, perhaps they acted inconsistently with their desire to individually arbitrate their employees' wage and hour claims by engaging in settlement negotiations.  But this did not prejudice plaintiffs, as plaintiffs engaged in these negotiations to avoid the order compelling them to arbitrate their claims.  This order discerns no prejudice that would unravel the previous order to compel.

### 7.   THE PUTATIVE CLASS LACKS NUMEROSITY.

This order now, at last, turns to the matter of numerosity.  As a matter of fact, this order accepts defendants' submission of evidence and finds the putative class includes 238 members (before subtraction for arbitration) (Dkt. Nos. 172-1; 197 at 2).  The parties have engaged in discovery on the matter; plaintiffs deposed witnesses; and defendants rate as the appropriate source for this information (via their employee records).  Moreover, as discussed above, plaintiffs have failed to demonstrate the class list remains incomplete.

Next, this order finds 222 of the 238 putative class members agreed to arbitrate with defendants (Dkt. Nos. 172 (all attachments); 197 at 2; 203-4).  As discussed above, plaintiffs have forfeited all but one raised formation defect, which failed on the merits.  This leaves sixteen putative members, too few to proceed here as a class.  "While there is no bright-line rule as to how many class members are required to be sufficiently numerous, various courts have found that the numerosity factor is satisfied if the class comprises 40 or more members and have found it not satisfied when the class comprises 21 or fewer."  *Californians for Disability Rights, Inc., v. California Dep't Transp.*, 249 F.R.D. 334, 346 (N.D. Cal. 2008) (Judge Saundra Brown Armstrong).

United States District Court
Northern District of California

United States District Court
Northern District of California

**CONCLUSION**

Of the 238 putative class members, only sixteen did not agree to arbitrate.  The proposed class lacks numerosity.  Class certification is **DENIED**.

The remainder of the case shall proceed as follows:

1.  The remaining of the sixteen California employees who have not been compelled to arbitrate may intervene in this lawsuit as individual plaintiffs with counsel of their choosing.  Plaintiffs' counsel shall give prompt notice of this right (and the deadline for intervention) by first-class mail to these employees by **MARCH 26**.

2.  The remaining putative class members and FLSA collective members may pursue individual arbitration to vindicate their claims for relief.  The limitations clock has, however, restarted.  Plaintiffs' counsel shall provide prompt notice of this right by first-class mail to these employees by **MARCH 26**.

3.  To prevent future snafus, all motions to intervene are due and counsel shall specify the population of all plaintiffs herein by **MAY 13 AT NOON**.

4.  The non-expert discovery cut-off date shall be **JUNE 10**.

5.  The last date for designation of expert testimony and disclosure of full expert reports under FRCP 26(a)(2) as to any issue on which a party has the burden of proof ("opening reports") shall also be **JUNE 10**.

6.  The last date to file dispositive motions shall be **SEPTEMBER 9**.

7.  The final pretrial conference shall be held on **DECEMBER 1 AT 2:00 P.M.**

8.  A jury trial shall begin on **DECEMBER 13 AT 7:30 A.M.**, in Courtroom 12, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102.  Counsel shall please bear in mind, however, that the COVID-19 pandemic has already significantly disrupted in-court proceedings in this District and it remains foreseeable that the schedule will again need to change as circumstances require.  That being said, counsel shall also be prepared to try the case as planned unless and until directed otherwise.

**IT IS SO ORDERED.**

Dated:  March 3, 2021.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California